IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BIDWELL PHARMACY & MEDICAL SUPPLY, INC., on behalf of itself and all others similarly situated, | CIVIL ACTION No. |
| Plaintiff, | |
| v. | |
| LANNETT COMPANY, INC., IMPAX LABORATORIES, INC., WEST-WARD PHARMACEUTICALS CORPORATION, ALLERGAN PLC, MYLAN, INC., PAR PHARMACEUTICAL, INC., AND SUN PHARMACEUTICAL INDUSTRIES INC., | **CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Bidwell Pharmacy & Medical Supply, Inc., on behalf of itself and a putative nationwide class and separate putative state classes of Independent Pharmacies (such putative classes shall hereafter be referred to collectively as the "Classes") that indirectly purchased generic digoxin or doxycycline from defendants Lannett Company, Inc., Impax Laboratories, Inc., West-Ward Pharmaceuticals Corporation, Allergan PLC, Mylan, Inc., Par Pharmaceutical, Inc., or Sun Pharmaceutical Industries, Inc. (collectively "Defendants") in the United States ("U.S.") during the period from October 1, 2012 to the present (the "Class Period"), alleges as follows:

## I. INTRODUCTION

1.      This action arises out of an alleged price-fixing conspiracy by the Defendant generic drug manufacturers by which they collusively increased the price of two essential prescription drugs, generic digoxin and doxycycline, by over 880% and 8,200%, respectively.

Plaintiff and the Classes of Independent Pharmacies (defined below) paid anticompetitive price increases when acquiring the drugs indirectly.  Independent Pharmacies could not pass on the price increases at resale but rather were forced to absorb some or all of the price increases for substantial periods of time, causing them tens of millions of dollars in damages.

2.      Plaintiff seeks to recover damages incurred by itself and the Classes due to Defendants' and their co-conspirators' violations of various states' (and the District of Columbia's) antitrust laws and unfair trade practice statutes, by engaging in a conspiracy to artificially raise, maintain and stabilize the prices for generic digoxin and doxycycline.   Plaintiff also seeks, on its own behalf and on behalf of the Classes alleged herein, injunctive relief for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §§ 1, 3.

3.      As a result of Defendants' anticompetitive scheme, Plaintiff and the other members of the Classes were injured in that they paid more for generic digoxin and doxycycline than they otherwise would have paid absent Defendants' unlawful conduct.

4.      Plaintiff makes these allegations based on personal knowledge of the matters relating to itself and upon information and belief as to all other matters.

## II.      NATURE OF THE CASE

5.      Rising health care costs continue to be a major concern for drug purchasers. Generic drugs are an essential part of any solution to sustaining our health system and are central to efforts to increase patient access and generate savings for patients, taxpayers, employers, payers, providers and others. In recent years, however, the cost of certain commonly-used generic drugs has increased at extraordinary rates. These dramatic spikes are not merely the result of normal market forces. Instead, they are caused by the Defendant manufacturers'

unlawful, anticompetitive conduct to increase prices above what would be achieved through fair competition.

6.     Digoxin and doxycycline are drugs whose prices have been the object of such unlawful conduct. Both are old drugs, having been developed many decades ago, and made available in inexpensive generic forms for over 20 years. Recently, however, both drugs experienced radical price increases. Doxycycline, a common antibiotic used to treat a wide variety of infections, rose from an average market price in October 2013 of $20 to $1,849 in April 2014, an increase of 8,281%.  After October 2013, the price of digoxin, used to treat atrial fibrillation and other cardiac ailments, increased over 880%.

7.     The U.S. Department of Justice, Antitrust Division ("DOJ'') and the Connecticut Attorney General have undertaken an investigation of the generic drug industry.  As a result of the DOJ's investigation to date, grand jury subpoenas have been issued to all Defendants except West-Ward Pharmaceuticals Corporation.  In addition, it has been reported that in connection with the ongoing criminal investigation regarding digoxin and doxycycline, in the summer of 2016 a generic drug manufacturer applied to the DOJ's leniency program as provided for in the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 (ACPERA) Pub. L. No. 108-237, § 213(a)-(b), 118 Stat. 661, 666-668 (June 22, 2004).  To obtain leniency, an applicant must, to the satisfaction of the DOJ, provide information that substantiates criminal liability under the Sherman Act.

8.     The DOJ's investigation followed the congressional investigation and hearings prompted by the National Community Pharmacists Association's ("NCPA") January 2014 correspondence to the U.S. Senate Health Education Labor and Pensions ("HELP") Committee

and the U.S. House Energy and Commerce Committee, requesting hearings on the spike in

generic drug pricing.[1] The NCPA's news release states:

> Pharmacy acquisition prices for many essential generic drugs have risen by as
> much as 600%, 1,000% or more, according to a survey of more than 1,000
> community pharmacists conducted by NCPA. The same survey found that
> patients are declining their medication due to increased co-pays (or total costs for
> the uninsured) and that the trend has forced more seniors into Medicare's dreaded
> coverage gap (or "donut hole") where they must pay far higher out-of-pocket
> costs. "Over the last six months I have heard from so many of our members across
> the U.S. who have seen huge upswings in generic drug prices that are hurting
> patients and pharmacies['] ability to operate," NCPA CEO B. Douglas Hoey,
> RPh, MBA wrote in a letter to the panels' respective leaders, Chairman Tom
> Harkin (D-Iowa) and Ranking Member Lamar Alexander (R-Tenn.) and
> Chairman Fred Upton (R-Mich.) and Ranking Member Henry Waxman (D-
> Calif.).

9.      NCPA' s survey of community pharmacists found the following:

- 77% of pharmacists reported 26 or more instances over the past six months of a
  large upswing in a generic drug's acquisition price.
- 86% of pharmacists said it took the pharmacy benefit manager (PBM) or other
  third-party payer between two and six months to update its reimbursement rate
  (but not retroactively).
- Patients may be referred to other pharmacies because the community pharmacy
  cannot absorb losses of $40, $60, $100 or more per prescription filled.
- 84% of pharmacists said the unsustainable losses per prescription are having a
  "very significant" impact on their ability to remain in business to continue serving
  patients.

10.     Digoxin and doxycycline are two of the drugs Congress is focused on in the

investigation. The investigation encompasses generic drugs other than digoxin and doxycycline.

Plaintiff reserves the right to amend its Complaint to add more parties and/or claims as more

information is revealed.

---

[1] The news release is available at http://www.ncpanet.org/newsroom/news-
releases/2014/0l/08/generic-drug-price-spikes-demand-congressional-hearing-pharmacists-say.

### III.   JURISDICTION AND VENUE

11.     Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees for injuries sustained and likely to be sustained by Plaintiff and the members of the Classes, by reason of the violations of Section 1 of the Sherman Act, 15 U.S.C. §§ 1, 3.  This action is also instituted under the antitrust and consumer protection laws of various states and the District of Columbia for damages and alleges common law unjust enrichment.  The Court has jurisdiction as conferred by 28 U.S.C. §§ 1331, 1337 and 1367.  Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c), and (d), because, during the Class Period (defined below), Defendants resided, transacted business, were found or had agents in the United States, including this District.  In addition, Defendants Lannett Company Inc. and Mylan, Inc. are headquartered in this District.

12.     During the Class Period, Defendants sold and shipped generic drugs in a continuous and uninterrupted flow of interstate commerce, which included sales of generic digoxin and doxycycline in the United States, including in this District.  Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District.

13.     Throughout the Class Period, there was a continuous and uninterrupted flow of invoices and other documents essential to the sale and provision of doxycycline and digoxin transmitted interstate between and among offices of Defendants and their customers throughout the United States.

14.     This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District;

(b) participated in the selling and distribution of generic digoxin and doxycycline throughout the United States, including in this District; (c) had and maintained substantial contacts with the United States, including in this District; and/or (d) was engaged in an unlawful conspiracy to inflate the prices for generic digoxin and doxycycline that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## IV.    THE PARTIES

### A.    Plaintiff

15.    Plaintiff Bidwell Pharmacy & Medical Supply, Inc. ("Plaintiff" or "Bidwell") is a corporation organized and existing under the laws of the State of California, having its principal place of business at 1200 Mangrove Avenue, Chico, California 95926.  Bidwell is an independent, community pharmacy, and indirectly purchased generic digoxin and generic doxycycline for resale during the Class Period and was injured as a result of Defendants' unlawful conduct.

### B.    Defendants

16.    Lannett Company, Inc. ("Lannett") is a Delaware corporation that has its principal place of business in Philadelphia, Pennsylvania. Lannett is a distributor of generic digoxin and generic doxycycline, among other generic drugs.  Lannett primarily markets its generic drug products to drug wholesalers, retail drug chains, distributors and government agencies.  During the Class Period, Lannett sold generic digoxin and generic doxycycline to purchasers in this District and throughout the United States.

17.    In July 2014, Lannett received interrogatories and a subpoena from the State of Connecticut Office of the Attorney General concerning that Attorney General's investigation

6

into pricing of digoxin.  According to the subpoena, the Connecticut Attorney General is investigating any activities that resulted in (a) fixing, maintaining or controlling prices of digoxin, or (b) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law. Lannett claims that it is cooperating with the Connecticut Attorney General's investigation.

18.    Lannett also received a letter on October 2, 2014 from U.S. congressional investigators regarding price increases for generic drugs.  Lannett was asked to provide information regarding the escalating prices for doxycycline and another drug.  On December 5, 2014, Lannett was served with a grand jury subpoena related to the continuing federal investigation of generic pharmaceutical manufacturers under the Sherman Act.  The subpoena requests Lannett' s financial and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale or pricing of certain products.

19.    Lannett further disclosed that on November 3, 2014, Lannett's Senior Vice President of Sales and Marketing was served with a grand jury subpoena relating to a federal investigation of generic pharmaceutical manufacturers under the Sherman Act. The subpoena requests documents relating to Lannett's communications or correspondence with competitors regarding the sale of generic prescription drugs.

20.    Then, on December 5, 2014, Lannett was served with a second grand jury subpoena related to the federal investigation of generic pharmaceutical manufacturers under the Sherman Act. The subpoena requests documents relating to Lannett's corporate, financial and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale or pricing of certain products.

21.     Impax Laboratories, Inc. ("Impax") is a Delaware corporation that has its principal place of business in Hayward, California.  Impax also has facilities in New Jersey and Philadelphia. Impax's generics division is called Global Pharmaceuticals ("Global") and is a manufacturer and distributor of generic digoxin and generic doxycycline.  During the Class Period, Global sold generic digoxin and generic doxycycline to purchasers in this District and throughout the United States.

22.     Impax makes 96 different generic drugs, including generic doxycycline and digoxin. Total revenues for the second quarter 2015 for Impax increased 14% to $214.2 million, compared to $188.1 million in the prior year period. Impax is a member of the trade association Generic Pharmaceutical Association ("GPhA"), which is discussed below.  In addition, an Impax representative has a seat on the 2016 GPhA Board of Directors.

23.     Impax has also been the subject of investigation by the DOJ and the State of Connecticut Office of the Attorney General. According to an SEC filing by Impax:

a.     On November 3, 2014, a sales representative of Impax Laboratories, Inc. received a subpoena from the Justice Department's Antitrust Division requesting the production of documents to and testimony before the grand jury of the Eastern District of Pennsylvania. The request relates to any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications.

b.     On July 14, 2014, Impax received interrogatories and a subpoena from the State of Connecticut Office of the Attorney General concerning its investigation into sales of Impax's generic product, digoxin. According to the Connecticut Attorney General, the investigation seeks to determine whether anyone engaged in a contract, combination, or conspiracy in restraint of trade or commerce which has the effect of (i) fixing, controlling or maintaining prices, or (ii) allocating or dividing customers or territories relating to the sale of digoxin in violation of Connecticut state antitrust law. Impax stated that it intended to cooperate with the Connecticut Attorney General in producing documents and information in response to the subpoena.

24.     Defendant Par Pharmaceutical, Inc. ("Par") is a Delaware corporation with its corporate headquarters located in Chestnut Ridge, New York.  Par specializes in developing, licensing, manufacturing, marketing and distributing generic drugs in the United States. In January 2014, Par announced that it had entered into an exclusive supply and distribution agreement with Covis Pharma S.a.r.l. ("Covis") for the generic market in the U.S. for Covis's Lanoxin (digoxin) tablets.  Par then began selling and shipping 0.125 mg and 0.250 mg strengths of digoxin tablets in the U.S.  Par also manufactures generic doxycycline. During the Class Period, Par sold generic digoxin and generic doxycycline to purchasers in this District and throughout the U.S.  Par is a member of the GPhA and a Par representative has a seat on the 2016 GPhA Board of Directors.

25.     On December 5, 2014, Par received a subpoena from the DOJ requesting documents related to communications with competitors regarding Par's authorized generic version of Covis's Lanoxin (digoxin) oral tablets and its generic doxycycline products.

26.     Defendant West-Ward Pharmaceuticals Corporation ("West-Ward") is a Delaware corporation with its principal place of business in Eatontown, New Jersey.  West-Ward is one of the top generic prescription medication providers in the United States, offering both oral solid and injectable pharmaceuticals to a growing number of chain stores, wholesalers, distributors, health systems and government agencies. West-Ward is the U.S. agent and subsidiary of Hikma Pharmaceuticals PLC ("Hikma"), a London based global pharmaceutical company and is a manufacturer and distributor of generic digoxin. Hikma's 2014 annual report stated that "[g]enerics and injectables revenue were $216 million and $713 million, respectively (2013: $268 million and $536 million) including strong sales of doxycycline and

glycopyrrolate." During the Class Period, West-Ward sold generic digoxin and generic doxycycline to purchasers in this District and throughout the U.S.

27.     West-Ward received a letter on October 2, 2014 from U.S. congressional investigators seeking information regarding the escalating prices it was charging for doxycycline and other drugs. West-Ward is a member of the GPhA.

28.     Defendant Allergan PLC ("Allergan"), formerly Actavis PLC, is an Irish corporation that has its global headquarters in Dublin, Ireland and its U.S. administrative headquarters in Jersey City, New Jersey. During the Class Period, Allergan sold generic digoxin and generic doxycycline to purchasers in this District and throughout the U.S.

29.     Allergan is a $23 billion diversified global pharmaceutical company. Actavis's generics portfolio features more than 1,000 generics, branded generics, established brands and over-the-counter ("OTC") products. The company is the third largest generic drug manufacturer in the U.S. and holds a top 5 leadership position in nearly 20 international markets.

30.     Allergan, then Actavis, received a letter on October 2, 2014, from U.S. congressional investigators regarding price increases for generic drugs. Actavis was asked to provide information regarding the escalating prices it was charging for doxycycline.

31.     As one article noted, "[l]ike the other generic manufacturers who have been subpoenaed - Impax Laboratories, Lannett Company, and Par Pharmaceutical Companies, Inc. Actavis has manufactured digoxin. Actavis has also supplied doxycycline, which may be significant because Par had disclosed that its DOJ subpoena sought communications related to doxycycline."

32.     Defendant Mylan, Inc. ("Mylan") is a global generic and specialty pharmaceuticals company registered in the Netherlands and with operational headquarters in

Hatfield, Hertfordshire in the United Kingdom and a U.S. base of operations in Canonsburg, Pennsylvania. During the Class Period, Mylan sold generic digoxin and generic doxycycline to purchasers in this District and throughout the U.S. Mylan is a member of the GPhA and a Mylan representative has a seat on the 2016 GPhA Board of Directors.

33.     Mylan received a letter on October 2, 2014, from U.S. congressional investigators seeking information regarding the escalating prices it was charging for doxycycline and other drugs. In addition, in its SEC Form 10-K filed on February 16, 2016, Mylan N.V. reported that "[o]n December 21, 2015, the Company received a subpoena and interrogatories from the Connecticut Office of the Attorney General seeking information relating to the marketing, pricing and sale of certain of the Company's generic products (including Doxycycline) and communications with competitors about such products.''

34.     Defendant Sun Pharmaceutical Industries Inc. ("Sun") is headquartered in Cranbury, New Jersey, and is the U.S. subsidiary of parent company Sun Pharmaceutical Industries, Ltd. located in Mumbai, India.  Sun is a member of the GPhA and a Sun representative has a seat on the 2016 GPhA Board of Directors.  Sun received a grand jury subpoena as part of the DOJ's criminal investigation of the generic drug industry.  During the Class Period, Sun sold generic doxycycline to purchasers in this District and throughout the U.S. Sun's Indian parent company is the world's fifth-largest maker of generic drugs.

35.     Defendants have engaged in the conduct alleged in this complaint, and/or the Defendants' officers, agents, employees, or representatives have engaged in the alleged conduct while actively involved in the management of Defendants' business and affairs.

## V.    UNIDENTIFIED CO-CONSPIRATORS

36.    Various other persons, firms, entities and corporations, not named as Defendants in this Complaint, have participated as co-conspirators with Defendants in the violations alleged herein, and aided, abetted and performed acts and made statements in furtherance of the conspiracy.

37.    The true names and capacities, whether individual, corporate, associate, or representative, are unknown to Plaintiff at this time. Plaintiff may amend this complaint, as necessary, to allege the true names and capacities of additional co-conspirators as their identities become known through discovery.

38.    At all relevant times, other persons, firms, and corporations, referred to herein as "co-conspirators," the identities of which are presently unknown, have willingly conspired with Defendants in their unlawful restraints of trade as described herein.

39.    The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered, or committed by duly authorized officers, managers, agents, employees or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

## VI.    FACTUAL ALLEGATIONS

### A.    Overview of Generic Drug Market

40.    Generic drugs typically provide consumers with a low-cost alternative to brand name drugs while providing the same treatment. Specifically,

> A generic drug is the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use. Before approving a generic drug product, FDA requires many rigorous tests and procedures to assure that the generic drug can be substituted for the brand name drug. The FDA bases evaluations of substitutability, or "therapeutic equivalence," of generic drugs on scientific evaluations. By law, a generic drug product must contain the identical

amounts of the same active ingredient(s) as the brand name product. Drug products evaluated as "therapeutically equivalent" can be expected to have equal effect and no difference when substituted for the brand name product.[2]

41.     Further, "[d]rug products classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product. "[3]

42.     Generic versions of brand name drugs are priced significantly below their brand name versions. Because of the price differentials and other institutional features of the pharmaceutical market, generic versions are liberally and substantially substituted for their brand counterparts. In every state, pharmacists are permitted (and, in some states, required) to substitute a generic product for a brand name product unless the doctor has indicated that the prescription for the brand product must be dispensed as written. States adopted substitution laws following the federal government's 1984 enactment of the Hatch-Waxman Act (Pub. L. No. 98-417, 98 Stat. 1585 (codified at 15 U.S.C. §§ 68b-68c, 70b; 21 U.S.C. §§ 301 note, 355, 360cc; 28 U.S.C. § 2201; 35 U.S.C. §§ 156, 271, 282)).

43.     The FDA has recognized that "[g]eneric competition is associated with lower drug prices[.]"[4] Economic literature in the healthcare market has demonstrated that competition by generic products results in lower prices for consumers. In the period before generic entry, a brand name drug commands 100% of the market share for that drug and the brand name manufacturer can set the price without impact by competitive market forces. Once the first generic enters the market, however, a brand rapidly loses sales, as much as 90% or more by the

---

[2] http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G
[3] *Id.*
[4] FDA, Generic Competition and Drug Prices, *available* at http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm129385.htm.

end of the first year.[5] As more generic manufacturers enter the market, prices for generic versions of a drug predictably will continue to decrease because of competition among the generic manufacturers, and the loss of sales volume by the brand name drug to the corresponding generic accelerates as more generic options are available to purchasers.[6]

44.     A mature generic market, such as the markets for doxycycline and digoxin, has several generic competitors. Because each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating feature and the basis for competition among manufacturers.[7] Over time, generics' pricing nears the generic manufacturers' marginal costs.

45.     Generic competition usually enables purchasers to (a) purchase generic versions of the brand name drug at a substantially lower price than the brand, and/or (b) purchase the brand name drug at a reduced price. Generic competition to a single branded drug product can result in billions of dollars in savings to wholesalers, retailers, consumers, insurers, and other drug purchasers. One study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[8]

---

[5] FTC, Pay-For-Delay: How Drug Company Pay-Offs Cost Consumers Billions, at 8 (Jan.2010), *available at* https://www.ftc.gov/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff.

[6] *See*, *e.g.*, Ernst R. Berndt, et al., *Authorized Generic Drugs. Price Competition, And Consumers' Welfare*, Health Affairs 26, no. 3 (2007):790-799.

[7] *See*, *e.g.*, FTC, Authorized Generic Drugs: Short-Term Effects and Long-Term Impact, at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price."); Congressional Budget Office, "*How Increased Competition from Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry*" (July 1998).

[8] Generic Pharmaceutical Association, *Generic Drug Savings in the US.*, at 1 (2015), *available at* www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

46.     Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), drug companies that want to introduce a generic drug to the market file an Abbreviated New Drug Application ("ANDA") with the FDA's Center for Drug Evaluation and Research, Office of Generic Drugs. The filing is called "abbreviated" because the ANDA sponsor references data submitted in connection with the approval of the Reference Listed Drug ("RLD") (the brand name drug). "By designating a single reference listed drug as the standard to which all generic versions must be shown to be bioequivalent, FDA hopes to avoid possible significant variations among generic drugs and their brand name counterpart."[9]

47.     An ANDA sponsor is generally not required to include clinical trial data to establish the safety and efficacy of the drug. Instead, a generic drug company must show that its generic product is "bioequivalent" to the name brand drug,[10] i.e., the generic product and the brand RLD have the same (i) active ingredient, (ii) maximum amount of drug in the blood at a given time, (iii) total amount of drug in the blood over time, (iv) strength, dosage, dosage form, (v) expected safety and efficacy, and (vi) FDA approval of manufacturing facilities. Upon the FDA's determination that bioequivalence has been established, the ANDA applicant may manufacture and market its generic drug in the U.S. as interchangeable with the RLD.

48.     Generic drugs that are bioequivalent to an RLD are assigned a Therapeutic Equivalence Code ("TE Code").[11] An oral generic drug product will be coded "AB" if it is bioequivalent to the RLD. This coding assures users that the FDA has determined that a particular approved product as therapeutically equivalent to other pharmaceutically equivalent

---

[9] http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#RLD

[10] http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#A

[11] http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#T

products. Thus, generic drugs that are AB-rated to the brand share the same safety and efficacy characteristics and are the same dosage size and form.

### B.     Generic Digoxin Market and Pricing Information

49.     Digoxin is used to treat atrial fibrillation (heart arrhythmia) and heart failure. Many elderly patients with cardiac issues are prescribed digoxin. Digoxin is derived from digitalis, an extract of the foxglove plant, which was first described in medical literature in 1785.

50.     Digoxin is such a standard heart medication that the World Health Organization includes it on its list of essential medicines. More than 6.5 million Americans were prescribed the drug in 2012.  Data published by QuintilesIMS (formerly IMS Health)[12]  (cited by defendant Par in 2014) showed annual U.S. sales of digoxin tablets at approximately $44 million. Defendant Lannett's 2015 Form 10-K states that net sales of digoxin totaled $49 million in fiscal year 2015.

51.     Generic digoxin is substitutable for the name brand drug Lanoxin, which is currently manufactured by DSM Pharmaceuticals, Inc. and distributed by Covis. Formerly, Lanoxin was a registered trademark of GlaxoSmithKline ("GSK") until GSK's December 2011 sale to Covis. In January 2014, Par announced that it had entered into an exclusive supply and distribution agreement with Covis for the U.S. generic market for Lanoxin tablets. On April 1, 2015, Covis, including its rights to Lanoxin, was acquired by Concordia Healthcare Corp. ("Concordia").

---

[12] The QuintilesIMS Institute conducts research and publishes the results for use by governments, payers, academia and the life sciences industry. http://www.imshealth.com/en/thought-leadership/quintilesims-institute/about-the-quintilesims-institute.

52.     Prior to July 26, 2002, many drug manufacturers produced and sold digoxin. Because digoxin is a drug that was available before the passage of the 1938 Federal Food, Drug, and Cosmetic Act, digoxin was marketed outside of the normal NOA-ANDA regulatory process. As a result, numerous manufacturers produced and marketed digoxin tablets, subject only to the requirements of the former 21 C.F.R. § 310.500, "which established conditions for marketing digoxin products for oral use (tablets and elixir)." However, subsequent FDA rule-making, effective on July 26, 2002, required manufacturers of digoxin tablets to submit NDAs or ANDAs for FDA approval.

53.     On September 30, 1993, GSK filed an NDA for the approval digoxin tablets, under the brand name Lanoxin. GSK's NDA sought FDA approval of the following strengths: 0.0625 mg, 0.125 mg, 0.187 mg, 0.25 mg, 0.375 mg, and 0.5 mg.

54.     However, during its NDA approval process, GSK ultimately decided not to pursue marketing of the 0.0625 mg, 0.187 mg, 0.375 mg, and 0.5 mg strengths. As a result, in its September 30, 1997 approval letter, the FDA approved the manufacturing and sale of the 0.125 mg and 0.25 mg tablets only.

55.     Because GSK's Lanoxin was not protected by any patents, generic competitors were able to enter the market shortly after GSK began marketing Lanoxin. Indeed, because digoxin was not a new chemical entity, GSK was only entitled to three years of brand exclusivity - i.e., after three years, the FDA could approve generic manufacturers' ANDAs for generic versions of Lanoxin.

56.     One of the first generics to file an ANDA for generic Lanoxin was Amide Pharmaceuticals, Inc. ("Amide"). Amide filed ANDA 040282 on October 21, 1997, seeking approval for digoxin tablets. The FDA granted final approval on December 23, 1999. Amide and

Mylan, through Mylan's wholly-owned subsidiary Bertek Pharmaceuticals, entered into a distribution agreement, whereby Mylan distributed Amide's approved digoxin tablets under the name "Digitek."

57.     The next generic to file an ANDA for generic Lanoxin was Jerome Stevens. Jerome Stevens filed ANDA 76268 on October 29, 2001, seeking approval for digoxin tablets. The FDA granted final approval on July 26, 2002. In March 2004, Jerome Stevens entered into a 10-year exclusive distribution agreement with Lannett, whereby Lannett became the exclusive seller of Jerome Stevens' digoxin tablets. In exchange, Jerome Stevens received four million shares of Lannett's common stock. In August 2013, this exclusive distribution deal was renewed for another five years.

58.     Lannett's 0.125 mg and 0.250 mg generic digoxin strength tablets have a TE Code of AB and are therapeutic equivalents to the Lanoxin 0.125 mg and 0.250 mg tablets. At least four other generic manufacturers entered the market for digoxin tablets after Lannett, including (a) Sun, which received approval for ANDA 076363 on January 31, 2003; (b) West-Ward, which received approval for ANDA 077002 on October 30, 2007; (c) Impax, which received approval for ANDA 078556 on July 20, 2009; and (d) Par, which entered into an agreement in 2014 to distribute Clovis' generic for Lanoxin.

59.     As of 2002, there were eight manufacturers of digoxin tablets. However, in the years since, the number of digoxin tablet manufacturers has steadily decreased. Mylan stopped selling digoxin tablets, even though it maintains an active ANDA in connection with this product. Its discontinuation of digoxin tablet sales appears to be related to a late-April 2008 recall of digoxin tablets distributed by Mylan because of quality control issues, which resulted in twice the amount of active ingredient to be present in their digoxin tablets. After that recall,

Mylan's share of the digoxin tablet market was wiped out. However, Mylan subsequently returned to the digoxin tablet market in approximately 2015.

60.     Similarly, Sun experienced manufacturing difficulties around the same time as Mylan. Its subsidiary, Caraco, received a Form 483 and a Warning Letter from the FDA relating to quality control practices at its Detroit facility. In March 2009, Caraco voluntarily withdrew certain lots of digoxin tablets because of manufacturing issues that resulted in inconsistent levels of the active ingredients being found in the tablets.

61.     On February 3, 2012, the FDA issued a Warning Letter to West-Ward regarding its failure to comply with Current Good Manufacturing Practice ("CGMP") regulations for Finished Pharmaceuticals, 21 C.F.R. Parts 210-11, at its Eatontown, New Jersey facility where West-Ward's digoxin tablets are manufactured.[13] The Warning Letter was directed specifically at testing and manufacturing failures relating to digoxin tablets.

62.     As a result of the FDA's Warning Letter, West-Ward "voluntarily ceased manufacturing of all product lines" and shuttered operations at its Eatontown facility temporarily in the beginning of 2013. After parent company Hikma financed $39 million of remediation measures, the Eatontown facility was reopened by July 2013, and West-Ward resumed manufacturing digoxin tablets. However, the issues relating to the Warning Letter were not fully resolved until March 26, 2014, when the FDA sent West-Ward a "close-out" letter.

63.     The difficulties faced by Impax's and Lannett's competitors with respect to the manufacturing and sale of digoxin tablets enabled Impax and Lannett to seize control of the market for generic digoxin tablets. According to Lannett's CEO, Arthur Bedrosian, the two companies were the only competitors in that market for a considerable period of time. Once

---

[13] http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2012/ucm291643.htm.

West-Ward's Eatontown facility reopened in the latter half of 2013, there were still only three generic manufacturers of digoxin tablets. Par's entry in January 2014 with an authorized generic version of Lanoxin increased the total generic manufacturers to four. Mylan's re-entry in 2015 increased the total generic manufacturers of digoxin tablets to only five.

64.     As explained below, however, the increase in the number of competitors has not produced the customary drop in prices; rather, prices have continued to remain at supra-competitive levels as a result of Defendants' unlawful conduct.

65.     Thus, until mid-October 2013, pricing of generic digoxin was stable. However, prices increased sharply without justification by Lannett, West-Ward, and Impax, followed by price increases by Par upon entering the market in 2014, and by Mylan upon entering the market in 2015. In addition, despite the entry of new competitors Par and Mylan to the market, the prices remained supra-competitive and did not decrease.

66.     For example, Lannett's reported sales of generic digoxin from its 10-Ks were $12.4 million in 2011; $10.9 million in 2012; $11.7 million in 2013; $54.7 million in 2014; and $49 million in 2015.

67.     More generally, while the annual sales of digoxin in the U.S. were approximately $44 million at the beginning of 2014, they rose sharply in 2014 and 2015.

68.     During the Class Period, generic drug prices were rising above and beyond the rate of general inflation at a rate of 12.9% versus 1.5%.  According to National Drug Acquisition Cost ("NADAC") data provided by the Healthcare Supply Chain Association ("HSCA"), the average price for generic digoxin alone increased as much as 884% from October 2012 to June 2014.[14]

---

[14] *See* Correspondence to Arthur P. Bedrosian, President and Chief Executive Officer of

69.     No potential drug shortage or supply disruption explains these price increases.

None of the Defendants reported any drug shortages or supply disruptions to the FDA in

explanation for the supra-competitive pricing of digoxin. Title X of the Food and Drug

Administration Safety and Innovation Act of 2012 ("FD ASIA") lists mandatory drug shortage

reporting requirements for drug manufacturers.

70.     On July 8, 2014, the New York Times reported as follows with respect to rapid

price increases of generic drugs:

> Digoxin provides a telling case study. There was no drug shortage, according to
> the Food and Drug Administration, that might explain the increase. There was no
> new patent or new formulation. Digoxin is not hard to make. What had changed
> most were the financial rewards of selling an ancient, lifesaving drug and
> company strategies intended to reap the benefits."[15] Further, "[t]he three
> companies selling the drug in the United States had increased the price they
> charge pharmacies, at least nearly doubling it since late last year, according to
> Evaluate Pharma, a London-based consulting firm." [16]

Lannett claimed that factors influencing price increases included "problems acquiring raw

material, increased costs of complying with Food and Drug Administration requirements and

manufacturers exiting the market."[17]

71.     However, as noted by the Generics and Biosimilars Initiative on August 29, 2014,

"[s]hortly after the arrival of Covis, the price of digoxin began to climb. It is not clear which

company started this. However, the price doubled in six months. At the time of the price

increases, the US Food and Drug Administration had reported no drug shortages, there was no

---

Lannett, from Senator Bernie Sanders and Congressman Elijah Cummings, dated October 2,
2014, available at http://www.sanders.senate.gov/download/letter-to-mr-bedrosian-president-
and-ceo-lannett-company-inc?inline=file.

[15] Elisabeth Rosenthal, *Rapid Price Increases for Some Generic Drugs Catch Users by Surprise,*
THE NEW YORK TIMES, July 8, 2014, available at
http://www.nytimes.com/2014/07/09/health/some-generic-drug-prices-are-
soaring.html?emc=eta1 & _r=O.

[16] *Id.*

[17] *Id.*

new patent or new formulation and digoxin is not difficult to make. The companies have not yet provided an explanation for the price rise."[18] When The New York Times sought comment from digoxin manufacturers, only Lannett responded. Lannett refused to discuss digoxin specifically, but stated, "On occasion and for a variety of reasons generic drug makers can and do raise prices." Those factors, it said, included problems acquiring raw material, increased costs of complying with FDA requirements and manufacturers exiting the market.

72.    None of these issues, however, explains the spike in digoxin prices. In fact, Lannett has benefitted greatly from the spike, with its sales reported in February 2014 to be the best in the company's history, according to statements by Lannett CEO Bedrosian to analysts. Lannett claims to have engaged outside counsel to conduct a review of its pricing practices, but it has not provided the complete results of that review. Instead, Lannett has stated that the results "confirm our belief that the company has and continues to adhere to applicable laws and regulations with regard to pricing of digoxin." Lannett declined, however, to disclose what it actually charges for digoxin.

73.    As analysts have noted: "A plausible explanation [for price increases of generic drugs, including generic digoxin] is that generic manufacturers, having fallen to near historic low levels of financial performance, are cooperating to raise the prices of products whose characteristics-low sales due to either very low prices or very low volumes-accommodate price inflation. "[19]

---

[18] http://www.gabionline.net/layout/set/print/content/view/full/3437.

[19] Ed Silverman, *Generic Drug Prices Keep Rising, but is a Slowdown Coming?*, WALL STREET JOURNAL (Apr. 22, 2015) (discussing analyst report by Sector & Sovereign Research), available at http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

74.     In February 2014, during a call with analysts regarding fourth quarter results for 2013, the former president of Impax, Carole Ben-Maimon, was asked about the "competitive dynamics" related to digoxin pricing with the entry by Par into the market and whether pricing was "rational." Dr. Ben-Maimon, who announced her resignation in October 2014, citing personal and family reasons, refused to provide specifics related to digoxin pricing, stating, "I don't want to really specifically talk about pricing on digoxin." She further noted that "the market has been pretty stable with [Lannett] and us .... We're pretty comfortable that what we have done is rational, and will result in ongoing profitability for that product."

75.     Defendants' conspiracy to fix prices and allocate markets and customers resulted in an over 800% increase in the prices of digoxin tablets. *See* Sections VI.G.-J. and VII below. The striking jump in prices can be seen in the following tables: [20]

---

[20] Source: Cornerstone Research Report, May 12, 2016



76.    The below chart demonstrates the steep increase in price of digoxin 0.125 mcg tablets in the latter part of 2013 and continuing into 2014.[21]

---

[21] *Id.*



77.     The below chart demonstrates the steep increase in price of digoxin 0.125 mcg tablets in the latter part of 2013 and continuing into 2014.[22]



---

[22] Data obtained for chart from https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Benefits/Prescription-Drugs/Pharmacy-Pricing.html.

78.     Overall, as alleged above, the average price for generic digoxin increased as much as 884% from October 2012 to June 2014.[23]

**C.      Generic Doxycycline Market and Pricing Information**

79.     Doxycycline is a tetracycline antibiotic prescribed to patients for the treatment of a variety of bacterial infections, including acne, urinary tract infections, eye infections, Lyme disease, intestinal infections, sexually-transmitted diseases, and gum disease, among others.[24]

80.     Doxycycline contains the base $C22H24N208$, derived from oxytetracycline, and is indicated to treat a broad spectrum of bacterial infections. Retail sales in the U.S. of doxycycline in 2013 were estimated to be over $972 million.

81.      Allergan, Lannett, Par, West-Ward, Mylan, Impax and Sun manufactured and sold one or more generic versions of doxycycline during the Class Period.

82.     At one point there were over 20 manufacturers of generic doxycycline. However, over the past decade, the number of generic drug manufacturers producing doxycycline has steadily dropped.  Major Pharmaceuticals, Teva Pharmaceuticals, and West-Ward were among the generic manufacturers that discontinued certain doxycycline product lines. Major Pharmaceuticals' and Teva Pharmaceuticals' discontinuations occurred in or around February 2013 and May 2013, respectively. West-Ward discontinued one line of doxycycline in or around July 2013.

---

[23] *See* Correspondence to Arthur P. Bedrosian, President and Chief Executive Officer of Lannett, from Senator Bernie Sanders and Congressman Elijah Cummings, dated October 2, 2014, available at http://www.sanders.senate.gov/download/letter-to-mr-bedrosian-president-and-ceo-lannett-company-inc?inline=file.
[24] Unless otherwise indicated, "doxycycline" refers herein to doxycycline monohydrate and doxycycline hyclate in tablet or capsule form.

83.     This reduction in the number of generic manufacturers increased concentration in the doxycycline market, facilitating price coordination and Defendants' conspiracy to fix, raise, maintain, and stabilize prices for doxycycline. *See* Sections VI.G.-J. and VII below.

84.     For example, the Los Angeles Times reported that in December 2012, an individual who purchased doxycycline paid $4.30 for 60 pills. Three months later, in February 2013, the price for the same quantity of doxycycline had jumped to $165.16.[25]

85.     Pembroke Consulting, a research firm, found that prices of doxycycline hyclate rose over 6,350% between November 2012 and November 2013.[26] According to an October 2014 U.S. Senate fact sheet on generic drug price increases, the average market price of doxycycline hyclate (bottle of 500, 100 mg tablets) increased from $20.00 in October 2013 to $1,849.00 in April 2014, an average percentage increase of 8,281 %.[27]

86.     For example, West-Ward's AWP pricing for generic doxycycline went from under $2.50 per day for 100 mg doxycycline hyclate capsule therapy to over $11 per day by January 2013.

87.     The following chart detailing the sudden increase in West-Ward's pricing for generic doxycycline was presented at the November 2014 Senate Hearing:[28]

---

[25] David Lazarus, *When a drug costs 30 times what it once did*, LOS ANGELES TIMES (Mar. 7, 2013 ), available at http://articles.latimes.com/20 l 3/mar/07/business/la-fi-lazarus-20130308.

[26] Victoria Colliver, *Prices soar for some generic drugs*, SFGATE (Jan. I, 2014), available at http://www.sfgate.com/health/article/Prices-soar-for-some-generic-drugs-5105538.php.

[27] U.S. Senate fact sheet on generic drug price increases, available at http://www.sanders.senate.gov/download/face-sheet-on-generic-drug-price-increases?inline=file.

[28] *Id.*



88.     The pricing of each of the Defendant sellers of doxycycline, Allergan, Impax, Lannett, Mylan, and Par, increased in lock-step over the same time period, with average prices of doxycycline increasing dramatically and anti-competitively starting in mid-October 2012.

89.     Retail prices exhibited a similarly large increase, jumping to $8.50 per day and WAC prices also increased to nearly $9.00 per day.[29]

90.     These spikes in price for doxycycline were not simply the product of one rogue doxycycline manufacturer. A rogue manufacturer's price gouging would have quickly disappeared because other generic doxycycline manufacturers would have negatively impacted that manufacturer's sales and market share with competitive, i.e., lower-priced, generic doxycycline. Rather, these supra-competitive prices were the product of a conspiracy among Defendants to raise, maintain, and stabilize the prices of doxycycline to purchasers in the United States.  See Sections VI.G.-J. and VII below.

---

[29] *Id.*

### D.      Independent Pharmacies

91.      Independent pharmacies, also known as independent community pharmacies, are privately-held businesses. They comprise single stores and multiple store locations. Independent pharmacies are retail pharmacies that are not affiliated with any large chain of pharmacies and are not owned or operated by a publicly traded company. Nor are they owned by or affiliated with hospital pharmacies, clinics, charitable or not-for-profit pharmacies, or government pharmacies. For purposes of this Complaint, and the class definitions set forth below in the Class Allegations, "Independent Pharmacies" means the independent pharmacies described in this paragraph.

92.      In 2014 there were 22,814 Independent Pharmacies in the United States, compared with 21,394 chain drug stores (e.g., CVS, Walgreens), 8,301 supermarket drug stores and 8,330 mass merchandiser drug stores (e.g., Wal-Mart, Target).

93.      Independent Pharmacies have high standards of customer service and regularly outperform chain pharmacy competitors with regard to customer satisfaction.  In rural areas or underserved locales, Independent Pharmacies more often than not are the only type of retail pharmacy serving the patient population.

94.      Independent Pharmacies dispense approximately 1.5 billion prescriptions annually, accounting for nearly 40% of retail prescriptions and nearly 20% of all prescriptions.

### E.      Chain of Distribution and Payment Networks

95.      To obtain, dispense and collect payment for multi-source generic drugs, Independent Pharmacies interact with a network of entities that includes drug wholesalers, third-party payors and their pharmacy benefit managers (PBMs), administrative service providers, and health plan enrollees.

96.     Drug wholesalers purchase bulk quantities of drugs from pharmaceutical manufacturers and then distribute them to pharmacies, including Independent Pharmacies.  For example, a wholesaler may fill an order from an Independent Pharmacy for a specified quantity of drugs produced by manufacturers and deliver the order to the pharmacy.  Three wholesalers – AmerisourceBergen Corporation, Cardinal Health Inc. and McKesson Corporation – account for the lion's share of all drug distribution in the United States.

97.     Independent Pharmacies primarily purchase drugs from wholesalers, often through collective buying groups known as pharmacy services administrative organizations ("PSAOs").  In 2010, approximately 15% of drug wholesalers' total sales to retail pharmacies were to Independent Pharmacies.

98.     After receipt of drugs from a wholesaler, Independent Pharmacies then fill and dispense prescriptions to consumers, chiefly health plan enrollees.

99.     Where the consumer is a health plan enrollee, the prescription is dispensed according to contractual terms agreed upon with each enrollee's health plan, i.e., with each third-party payor or its PBM.

100.    Third party payors include private and public health plans such as those offered by large corporations and the federal government through Medicare.  Many third-party payors use PBMs to help them manage their prescription drug benefits.

101.    PBMs assemble networks of retail pharmacies, including Independent Pharmacies, where the health plan's enrollees can fill prescriptions.  Typically, PBMs also provide health plans with cost containment and administrative services such as claims processing.

30

102.    A pharmacy becomes a member of a third-party payor's (or its PBM's) network by entering into an agreement with the third-party payor or its PBM.  Contract terms and conditions typically include specifics about reimbursement rates (how much the pharmacy will be paid for dispensed drugs), payment terms (for example, the frequency with which the third party payor or its PBM will reimburse the pharmacy for dispensed drugs), and audit provisions (the frequency and parameters of audits conducted on the pharmacy by the third party payor or its PBM).

103.    In 2012, the five largest PBMs represented over 330 million individuals.

104.    In addition, most Independent Pharmacies utilize a PSAO to interact on their behalf with third party payors, PBMs and/or to negotiate for drug purchases from wholesalers for Independent Pharmacies' buying groups.

105.    PSAOs represent networks of Independent Pharmacies with whom they contract. In 2012, there were approximately 22 PSAOs in the United States contracted to represent Independent Pharmacies.  Each Independent Pharmacy authorizes its PSAO to interact with third-party payors and their PBMs, as well as drug wholesalers, on the pharmacy's behalf.

106.    As of 2011, approximately 80 percent of Independent Pharmacies were represented by PSAOs.

107.    Independent Pharmacies are provided an ensemble of services by the PSAO, including collective purchasing of drugs from wholesalers, but the PSAO chiefly provides a contract negotiation service whereby the PSAO acts as the pharmacies' authorized agent to contract with third party payors and their PBMs on behalf of the pharmacies.

108.     When a PSAO enters into a contract with a third party payor or its PBM, the pharmacies in the PSAO's network gain access to the third party payor or PBM contract and the individuals it covers by virtue of belonging to the PSAO's network.

109.     There were approximately 22 PSAOs in 2012, with the five largest PSAOs combined contracting with the majority of pharmacies.

110.     The bulk contracts negotiated by PSAOs on behalf of thousands of pharmacies at a time end up with highly standardized terms, particularly key terms such as reimbursement rates, payment terms, price updates and appeals.

111.     The lack of differentiation in contract terms is due to PBMs' use of standard contract terms and the market power of the largest PBMs.  Key terms such as reimbursement rates are, for all intents and purposes, non-negotiable.  This is particularly true for national contracts, in which third-party payors or their PBMs have set contract terms for all pharmacies across the country that opt into the third party payor's, or its PBM's, network.

112.     Increasing consolidation of entities in the PBM market space in recent years has resulted in a few PBMs having large market shares, which has all but eliminated the ability of Independent Pharmacies, through their authorized PSAOs, to negotiate key terms such as reimbursement rates, payment terms, price updates and appeals.

### F.     Injury to Independent Pharmacies

113.     In an ordinary chain of distribution of a product, a reseller of the product typically is able to "pass on" some or all of a price increase originating upstream in the chain of distribution.  Because of the operation of the supply and payment networks for multi-source generic drugs, however, Independent Pharmacies absorbed some or all of the collusive price

increases for generic digoxin and doxycycline during the Class Period, with no ability to pass on the price increases.

114.    In 2014, a survey of Independent Pharmacies carried out by the NCPA found that 86 percent of pharmacists said it took the third party payor or its PBM between two and six months to update its reimbursement rates in the ordinary course of business, and when updates occurred they were not retroactive.

115.    Consequently, Defendants' overnight price increases for digoxin and doxycycline, achieved through the alleged conspiracy, caused Independent Pharmacies to pay the anticompetitive price when acquiring the drugs and then absorb that price increase through normal operation of the payment networks for such drugs, which saw the older, lower reimbursement rates in effect for substantial time periods.

116.    When Independent Pharmacies acquired the drugs at the artificially inflated drug price, and were reimbursed at the pre-collusion, lower price, they could not collect the difference from the health plan enrollee standing in the pharmacy, as the pharmacies' contracts with the health plans prohibited collecting anything other than the co-pay amount from the health plan enrollee.

117.    As a result of the Defendants' alleged conspiracy, Independent Pharmacies have suffered tens of millions of dollars in damages.

    **G.    Defendants' Coordination and Collusion on Generic Drug Pricing**

118.    There is no market-based reason for the large increases in digoxin or doxycycline prices. These price increases were unprecedented departures from pricing that had remained stable for over a decade.

119.    Defendants accomplished their price-fixing and market and customer allocation conspiracy through, among other things, public statements, meetings, and the exchange of information regarding pricing, costs, manufacturing, and supply issues.

120.    The purpose of these meetings and communications was to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful price-fixing and market and customer allocation scheme.

121.    As a result of their unlawful agreements, Defendants fixed the price for doxycycline during the period October 1, 2012 through the present and for digoxin tablets during the period October 1, 2013 through the present.

122.    In formulating and effectuating their conspiracy, Defendants engaged in numerous anticompetitive activities, including, among other things:

(a)    Attending joint meetings or otherwise engaging in joint discussions in the United States by telephone, facsimile, and electronic mail regarding the sale of doxycycline and digoxin tablets;

(b)    Agreeing to charge prices for doxycycline and digoxin tablets at specified levels, and otherwise fix, increase, maintain, and stabilize the prices and supply of doxycycline and digoxin tablets sold to purchasers in the United States;

(c)    Selling doxycycline and digoxin tablets to customers in the United States at collusive and supra-competitive prices pursuant to the agreements reached;

(d)    Accepting payments for doxycycline and digoxin tablets sold in the United States at collusive and supra-competitive prices;

(e)    Communicating with one another to discuss the prices, customers, markets, supply and manufacturing issues, and price levels of doxycycline and digoxin tablets sold in the

United States;

    (f)      Authorizing or consenting to the participation of employees in the conspiracy; and

    (g)      Concealing the conspiracy and conspiratorial contacts through various means.

123.    As a result of Defendants' unlawful agreement to restrain trade, Plaintiff and members of the Classes were injured because they paid, and continue to pay, supra-competitive prices for doxycycline and digoxin tablets sold in the United States.

124.    The large increases in digoxin or doxycycline prices cannot be explained by market-based circumstances, such as increased costs in connection with the production of these products. Rather, Defendants sustained their supra-competitive profits by conspiring to fix, raise, maintain, and stabilize the prices of doxycycline, digoxin, and other generic tablets, and allocate markets and customers for those products.

## H.    Defendants' Investor Conference Communications

125.    Defendants' statements in public investor calls and other public communications were part of the conspiracy to fix and increase generic drug prices and maintain them at supra-competitive levels. Defendants are sophisticated entities and each monitors the other's statements to investors.

126.    Defendants' statements and admissions in their annual reports and other investor communications emphasize the goal of increasing generic drug prices and maintaining them at supra-competitive levels.

127.    On September 10, 2013, Lannett's CEO Bedrosian stated in a fourth quarter earnings call that,

> We're not a price follower. We tend to be a price leader on price increasing and the credit goes to my sales vice president. He takes an aggressive stance towards raising prices. He understands one of his goals, his objectives as a sales vice president is to increase profit margins for the company. And he's the first step in

that process. I can reduce costs and manufacturing efficiencies, but it has to be combined with sales increase, a profit increase, as I should say, by the salespeople. And he's done a good job there. With 1 or 2 exceptions, we've tended to lead in the way of price increases. We believe that these prices are important. We need to try raising them. Sometimes, it doesn't stick and we have to go back and reduce our price, and other times it does. I am finding a climate out there has changed dramatically and I see more price increases coming from our competing - competitors than I've seen in the past. And we're going to continue to lead. We have more price increases planned for this year within our budget. And hopefully our competitors will follow suit. If they don't, that's their issue. But our plan is to raise prices on any product that we think we can or we haven't raised a price.[30]

128.    Mr. Bedrosian further described his expectation that other generics would also raise prices. After citing costs applicable to all generic firms, he stated that "I would expect that all the companies are not going to behave like they have in the past. And I suspect you're going to see more price increases in the generic marketplace or certainly less price erosion in the marketplace because of that."

129.    Three days later, Sun confirmed its agreement to Lannett's effort to keep prices at supra-competitive levels industrywide and not compete on price. On September 13, 2013, after reporting that its subsidiary URL "had undertaken price hikes in March," Sun noted that much of its FY 2014 revenue "$60-80 million (of $128 million in total revenue for URL estimated for FY[20] 14)" would come from doxycycline,[31] affirming its intent to maintain its price increases.

130.    Impax also agreed. On November 4, 2013, then Impax President Carole Ben-Maimon acknowledged that Impax had increased the price of digoxin after Lannett had increased its price. Ms. Ben-Maimon's comments made clear that Impax would not compete for market

---

[30] Transcript available at http://seekingalpha.com/article/1685792-lannett-management-discusses-q4-2013-results-earnings-call-transcript?all =true&find= Lannett%2Beamings%2 Bcall.

[31] Ujjval Jauhari, *Sun Pharma's Prospects Remain Bright*, BUSINESS STANDARD (Sept. 12, 2013 ), available at http://www.business-standard.com/article/markets/sun-pharma-s-prospects-remainbright-113091200894_1.html.

share in the digoxin market by offering lower prices, claiming instead that its focus was on "mak[ing] sure that a high quality product is available to the customer."[32]

131.    On November 7, 2013, on Lannett's first quarter 2014 earnings call, Mr. Bedrosian, recognizing that Lannett's generic competitors had accepted his signal, confirmed his belief that all generic companies would continue to adhere to the common understanding on price: "So these price increases that are going on in the industry, I think they're going to stick for all the companies."[33]

132.    Par followed.  Despite being in a competitive market, Par priced its product comparably to the products of Lannett and Impax. In a February 6, 2014 earnings call for Lannett's second quarter of 2014, Bedrosian acknowledged Par's commitment to the scheme, noting that he viewed Par as "one of our rational competitors in the marketplace."[34]

133.    In February 2014, Lannett reported that its sales were the best in company history. Lannett's Mr. Bedrosian explained that the sales were driven by "price increases on key products, strong sales of existing products and favorable product mix."[35]

134.    Acknowledging her continued acceptance of Lannett' s price increase agreement, Impax's Ben-Maimon stated during a February 2014 call with analysts that "the market has been pretty stable with [Lannett] and us ... [w]e're pretty comfortable that what we have done is rational and will result in ongoing profitability for that product."[36]

---

[32] Impax Q4 2013 Earnings Call Transcript (Nov. 4, 2013).
[33] Lannett Ql 2014 Earnings Call Transcript (Nov. 7, 2013).
[34] Transcript available at http://seekingalpha.com/article/2002271-Iannett-managementdiscusses-q2-2014-results-earnings-call-transcript?all=true&find=Lannett%2Bearnings%2Bcall.
[35] Lannett Q2 2014 Earnings Call Transcript (Feb. 6, 2014).
[36] Impax Laboratories Earnings Conference Call Transcript (Feb. 20, 2014).

135.    Mr. Bedrosian of Lannett similarly stated in a February 4, 2015 earnings call, in response to a question regarding the sustainability of pricing:

> So I'm expecting these pricings to really sustain themselves to continue. I see people raising prices further, because the generic prices were so low, when you're 10% of the brand, that's not because the brand overpriced the product by 90%. It's because the generic marketplace has so much competition sometimes, people get desperate just to unload their inventory that they cut the prices. We don't see that kind of behavior sustainable, and we don't see it going further into the future. I think you're going to find more capital pricing, more - I'll say less competition, in a sense. You won't have price wars. You are still going to have competition, because there's a lot of generic companies in the market. I just don't see the prices eroding like they did in the past. It's really unfortunate, but what they see some significant pricing, cost increases, I should say, that are driving this.[37]

136.    On March 12, 2014, Hikma, West-Ward's parent, similarly announced forecasted continued growth in 2014, also reflecting continued commitment to maintaining its doxycycline pricing.[38] Hikma's CEO similarly stated that he was "confident about the prospects for 2014," and noted that in 2013, "[o]ur Generics business delivered very strong revenue, driven primarily by doxycycline, and generated significant cash flow."[39]

137.    In a Lannett quarterly earnings call held on November 3, 2014, Mr. Bedrosian again noted Lannett's freedom from price competition and commitment to raising prices, stating, "from my perspective, what we're seeing here is an opportunity to raise prices because everybody has accepted the fact that our costs are going up dramatically and less concerned about grabbing market share. We're all interested in making a profit, not how many units we sell."[40]

---

[37] Transcript available at http://seekingalpha.com/article/2885806-lannetts-lci-ceo-arthur-bedrosian-on-q2-2015-results-eamings-calltranscript?all=true&find=Lannett%2Bearnings%2Bcall.

[38] Press Release, Hikma Pharmaceuticals plc (Mar. 12, 2014).

[39] *Id.*

[40] Lannett Ql 2015 Earnings Call Transcript (Nov. 3, 2014).

138.   According to Lannett's 2014 annual report, digoxin accounted for 20% of Lannett's fiscal 2014 net sales and 8% of Lannett's 2013 fiscal net sales.

139.   The CEO of Impax, Frederick Wilkinson, echoed Lannett's message on increasing prices in a third quarter earnings call on November 4, 2014, that,

> [L]et me address pricing. We really don't talk much about pricing publicly, and whether we're going for competitive reasons but surprising to say we've done what most of the other generic competitors have done, we look at opportunities, we look at how competition shifts, we look at where there may be some market movement that will allow us to take advantages on price increases and we've implemented those and we'll continue to evaluate our line product-by-product probably a week and monthly basis to see if there are some opportunities to participate in that practice.[41]

Wilkinson also acknowledged the federal investigation of pricing in the pharmaceutical industry during the November 2014 earnings call.[42]

140.   On a February 4, 2015 earnings call, Mr. Bedrosian of Lannett stated, in response to a question regarding the sustainability of pricing, that "we've sustained these price increases now probably close to three years. . . . So I'm expecting these pricings to really sustain themselves to continue. . . . I think you're going to find more capital pricing, more - I'll say less competition, in a sense. You won't have price wars."[43]

141.   Defendants often cited to increased costs to justify their collusive price increases. That these justifications were pretextual is demonstrated by the fact that throughout the period, Defendants were making record or unprecedented profits from their generic products.

142.   For example, Impax experienced a substantial growth in revenues due to its inflated digoxin tablet prices. During a third quarter 2014 earnings call with investors,

---

[41] Transcript available at http://seekingalpha.com/article/2638955-impax-laboratories-ipxlceo-frederick-wilkinson-on-q3-2014-results-earnings-call-transcript.
[42] *Id.*
[43] Lannett Q2 2015 Earnings Call Transcript (Feb. 4, 2015).

Mr. Wilkinson also stated that "[o]ur second quarter revenues increased 19% to $158 million."[44] The generics division of Impax, Global Pharmaceuticals, grew at a rate that outpaced the company as a whole, increasing 26%, or $30 million, over the third quarter of 2013.  According to Bryan Reasons, Impax's CFO, this growth was attributable, in part, "from higher sales of Digoxin and Oxymorphone.[45]

143.     Sun similarly reported in September 2015 and February 2016 investor presentations that one of the "key drivers" of its sales through the period 2012 through 2014 was doxycycline, which it described as a "low competition product[]" in the United States-a notable description in light of the large number of competitor products.

144.     Lannett's Mr. Bedrosian stated that "[t]or the fiscal 2014 fourth quarter, we [Lannett] recorded the highest net sales, gross margin and net income in our company's 72-year history." Compared with fourth quarter 2013 results, Bedrosian stated that "net sales doubled to $81 million, gross margin more than tripled, and net income grew 6-fold to $24 million."[46]

145.     In 2013, Hikma reported that "Strong cash flow reflects exceptional profitability of doxycycline." "Sales of doxycycline generated exceptionally strong cash flows" and Hikma used some of that cash flow to help "paydown of debt of $117 million. "[47] In March 2014, Hikma, West-Ward's parent, announced that revenues from its generic products increased 158% to $268 million, "reflecting very strong doxycycline sales."

---

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] Hikma Pharmaceuticals plc 2013 Preliminary Results, *available at* http://www.hikma.com/~/media/Files/H/Hikma/Attachments/pdf/prel-res-pres-12032014a.pdf.

I.      **Defendants' Trade Organization Meetings**

146.    Defendants have opportunities to communicate and collude through trade organizations.  According to news reports, the Policy and Regulatory Report ("PaRR") obtained information regarding the investigation of generic drug companies by the DOJ.  According to PaRR, the DOJ is investigating whether trade organizations are a potential vehicle for collusion between salespeople at different generic drug companies.[48]

147.    Defendants were members of trade associations, which they used to facilitate their conspiratorial communications and implement their price-fixing scheme. For example, the Generic Pharmaceutical Association ("GPhA") is the "leading trade association for generic drug manufacturers and distributors, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."[49] GPhA was formed in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

148.    According to GPhA's website, "GPhA member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year." GPhA states that, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry and help secure the future of this vital pharmaceutical market segment. In addition, GPhA provides valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[50]

---

[48] http://www.fiercepharma.com/story/actavis-gets-subpoena-doj-probe-generic-pricing-moves-food-chain/2015-08-07.

[49] http:www.gphaonline.org/about/the-gpha-association.

[50] http://www.gphaonline.org/about/membership.

149.    Defendants Impax, Sun, and Par have representatives on GPhA's 2016 Board of Directors.  Defendant West-Ward is a member of GPhA.

150.    Current "Regular Members" of the GPhA include Defendants Impax, Mylan, Par, Sun, and West-Ward.  Regular Members ''are corporations, partnerships or other legal entities whose primary U.S. business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/ biogeneric products; or (4) DESI products." Several of Defendants' high-ranking officers serve on GPhA's board of directors, including Mylan's Heather Bresch, Impax's Marcy MacDonald, Par's Tony Pera, and Sun's Jim Kedrowski.  Ms. Bresch serves as the GPhA's current Chairperson.

151.    Representatives from Defendants attended meetings held by GPhA from February 2012 to October 2014.

**J.    Government Investigations**

152.    Defendants' conduct in generic drug pricing is the subject of federal government investigations by the U.S. Senate and DOJ, as well as a state government investigation.

153.    In July 2014, Lannett reported that it and "at least one of its competitors" received a subpoena and interrogatories from the Connecticut Attorney General's Office concerning its investigation into the pricing of digoxin.  According to Lannett's 2014 Annual Report, the Connecticut Attorney General was "investigating whether anyone engaged in any activities that resulted in (a) fixing, maintaining or controlling prices of digoxin or (b) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law."

154.    Two of Lannett's competitors, Impax and Par, were also subpoenaed by the Connecticut Attorney General in relation to the pricing of digoxin.  Mylan N.V., parent company

to Mylan Pharmaceuticals, Inc., reported on February 16, 2016 in its 10-K that, "[o]n December 21, 2015, the Company received a subpoena and interrogatories from the Connecticut Office of the Attorney General seeking information relating to the marketing, pricing and sale of certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."

155.    On October 2, 2014, U.S. Senator Bernie Sanders and U.S. Representative Elijah E. Cummings sent letters to fourteen drug manufacturers, including Defendants Lannett, Par, and West-Ward, seeking information relating to the escalating prices of generic drugs (the "October Letters").

156.    The October letter to Lannett, for example, states,

> We are writing to your company to request information about the escalating prices it has been charging for two drugs: Digoxin and Doxycycline Hyclate, which are used to treat certain types of irregular heartbeats and heart failure, and to treat a variety of infections, respectively. According to data provided by the Healthcare Supply Chain Association (HSCA), the average price charged for this drug has increased by as much as 8281 percent from October 2013 to April 2014. Over that time period, the average market price went up by as much as $1,829. Additionally, according to National Average Drug Acquisition Cost Data provided by HSCA, the average price charged for Digoxin has increased by as much as 884 percent from October 2012 to June 2014.[51]

157.    In Lannett's October letter, Senator Sanders and Congressman Cummings seek the following information and documents from January 1, 2012 to the present:

(1)    Total gross revenues from the company's sales of these drugs;

(2)    The dates, quantities, purchasers, and prices paid for all sales of these drugs;

---

[51] *See* Correspondence to Arthur P. Bedrosian, President and Chief Executive Officer of Lannett, from Senator Bernie Sanders and Congressman Elijah Cummings, dated October 2, 2014, available at http://www.sanders.senate.gov/download/letter-to-mr-bedrosian-president-and-ceo-lannett-company-inc?inline=file.

(3)     Total expenses relating to the sales of these drugs, as well as the specific amounts for manufacturing, marketing and advertising, and purchases of active pharmaceutical ingredients, if applicable;

(4)     Sales contracts or purchase agreements for active pharmaceutical ingredients for these drugs, including any agreements relating to exclusivity, if applicable;

(5)     A description and valuation of the specific financial and nonfinancial factors that contributed to your company's decisions to increase the prices of these drugs;

(6)     Any cost estimates, profit projections, or other analyses relating to the company's current and future sales of these drugs;

(7)     Prices of these drugs in all foreign countries or markets, including price information for the countries paying the highest and lowest prices; and

(8)     The identity of company official(s) responsible for setting the prices of these drugs over the above time period.

Lannett's October letter provided that the requested information and documents be turned in to congressional offices by October 23, 2014.

158.     The U.S. Senate HELP Committee held a hearing on November 20, 2014, "Why Are Some Generic Drugs Skyrocketing in Price?"  Lannett's CEO Bedrosian was invited to testify but he did not attend the hearing.[52]

159.     During the Senate hearing on generic drug prices, pharmacist Rob Frankil testified on November 20, 2014 that, "it was extremely concerning when about a year ago, pharmacies began noticing a rash of dramatic price increases for many common, previously low-cost generic drugs."[53] According to Frankil, digoxin and doxycycline were two of the generic drugs with price spikes. With respect to digoxin, Frankil stated that,

A recent example from my own experience is the price of Digoxin- a drug used to treat heart failure. The price of this medication jumped from about $15 for 90 days' supply, to about $120 for 90 days' supply. That's an increase of 800%. One

---

[52]http://www.sanders.senate.gov/newsroom/press-releases/drugmakers-mum-on-huge-price-hikes.

[53] http://www.help.senate.gov/imo/media/doc/Frankil.pdf

of my patients had to pay for this drug when he was in the Medicare Part D coverage gap in 2014. Last year, when in the coverage gap he paid the old price. This year he paid the new price. Needless to say, the patient was astounded, and thought I was overcharging him. The patient called all around to try to get the medicine at the old, lower price, but to no avail. This caused him lots of stress and time, and caused us lots of stress and time in explaining the situation, reversing, and rebilling the claim. This example is typical of how these price spikes put consumers and pharmacists in a bad position, often grasping at straws for explanations. And all the while, everyone pays more, including the patient, the pharmacy, and the insurer (often the federal government).[54]

160.     The DOJ opened a criminal grand jury investigation into Defendants' conduct on or about November 3, 2014.  Grand jury subpoenas have been issued to Lannett, Lannett's Vice-President of Sales and Marketing Kevin Smith, Impax, an unidentified sales representative of Impax, Allergan, Par and Mylan.

161.     The fact that grand jury subpoenas were served on Defendants indicates that they have potentially violated antitrust law.  According to the DOJ's *Antitrust Division Manual*, "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."[55] If a grand jury request memorandum is approved by the DOJ field office chief: "a grand jury request should be emailed to the ATR-CRIM-ENF [Antitrust Criminal Enforcement Division]." [56] "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation."[57] Then, "[t]he investigation should be conducted by a grand jury in a judicial district where venue lies for the

---

[54] *Id.*

[55] *See* Antitrust Division Manual, Chapter III, Section F.1 at III-82 (2015).

[56] *Id.*

[57] *Id.* at III-83.

offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[58]

162.     On February 24, 2015, Senator Sanders and Congressman Cummings sent a letter to the Office of the Inspector General ("OIG") of the Department of Health and Human Services asking that the OIG "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare and Medicaid programs."[59]  The OIG responded to the request on April 13, 2015, and stated that it planned to review quarterly average manufacturer prices ["AMPs"] for the top 200 generic drugs from 2005 through 2014, and would "determine the extent to which the quarterly AMPs exceeded the specified inflation factor. "[60]

163.     Lannett's 10-Q report dated February 6, 2015, discloses that on November 3, 2014, "the Senior Vice-President of Sales and Marketing was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act," and that on December 5, 2014, "[t]he Company was served with a grand jury subpoena related to the federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act. The subpoena requests corporate documents from the Company relating to corporate, financial, and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale or pricing of certain products."

164.     Lannett disclosed in its annual report for fiscal year ending June 30, 2015, that,

[T]he Company and certain affiliated individuals each were served with a grand

---

[58] *Id.*

[59] http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[60] http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act. The subpoenas request corporate documents of the Company relating to corporate, financial, and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas.[61]

Lannett also reported that "Levothyroxine Sodium and Digoxin collectively accounted for 50% of our net sales in fiscal year 2015," and "[n]et sales of [digoxin] totaled $49.0 million in fiscal year 2015. "[62]

165.    Par, Impax, Allergan and Mylan have also disclosed in SEC filings that they have been served with subpoenas:

166.    Par's 10-K dated March 12, 2015 states that "[o]n December 5, 2014, we received a subpoena from the Antitrust Division of the DOJ requesting documents related to communications with competitors regarding our authorized generic version of Covis's Lanoxin (digoxin) oral tablets."[63] Par's parent company, Endo, stated in a 10-Q for the third quarter of 2015 that, "[o]n December 5, 2014, the Company's subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and other regarding those products. Par is cooperating fully with the investigation."

---

[61] http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.
[62] *Id.*
[63] https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.

167.    Impax's 2015 annual report dated February 22, 2016 states that, "[p]reviously on November 6, 2014, the Company disclosed that one of its sales representatives received a grand jury subpoena from the Antitrust Division of the United States Justice Department (the "Justice Department"). In connection with this same investigation, on March 13, 2015, the Company received a grand jury subpoena from the Justice Department requesting the production of info1mation and documents regarding the sales, marketing, and pricing of certain generic prescription medications. In particular, the Justice Department's investigation currently focuses on four generic medications: digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution. The Company has been cooperating and intends to continue cooperating with the investigation. However, no assurance can be given as to the timing or outcome of the investigation."

168.    Allergan's February 26, 2016 10-K for fiscal year ending December 31, 2015, disclosed that with respect to its Actavis division, "[o]n June 25, 2015, the Company received a subpoena from the U.S. Department of Justice ("DOJ"), Antitrust Division seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products. The Company intends to cooperate fully with the DOT's requests."

169.    Mylan N.V. reported in its 10-K for fiscal year ending December 31, 2015, filed on February 16, 2016, that "[o]n December 3, 2015, a subsidiary of Mylan N.V. received a subpoena from the Antitrust Division of the U.S. Department of Justice ("DOJ") seeking information relating to the marketing, pricing, and sale of our generic Doxycycline products and any communications with competitors about such products. The Company intends to fully cooperate with DOJ's inquiry."

170.    The congressional and governmental investigations are ongoing.

## VII.   THE GENERIC DRUG MARKET IS HIGHLY SUSCEPTIBLE TO COLLUSION

171.    The factors necessary to show that a market is susceptible to collusion are present

in this case:

(1)    *High Degree of Industry Concentration* - As discussed above, a small number of competitors control a significant market share for generic digoxin and generic doxycycline.

(2)    *Barriers to Entry* - Costs of manufacture, intellectual property and expenses related to regulatory oversight are barriers to entry in the generic drug market. Barriers to entry increase the market's susceptibility to a coordinated effort among the dominant entities in the generic drug industry to maintain supra-competitive prices.

(3)    *Demand Inelasticity* - Generic digoxin and generic doxycycline are necessary treatment for millions of patients. Both generic digoxin and generic doxycycline are on the WHO's list of essential medicines.

(4)    *High Degree of Interchangeability* - Defendants' generic digoxin and generic doxycycline products are each interchangeable as they contain the same chemical compounds made from the same raw materials. Thus, generic digoxin and generic doxycycline are standardized across suppliers and are highly interchangeable from one defendant to the next. Lannett's Mr. Bedrosian has acknowledged the commodity nature of Lannett's generic business.[64]

(5)    *Absence of Competitive Sellers* - Defendants have increased prices despite the entry of new suppliers to the market. Further, Defendants have maintained supracompetitive pricing for generic digoxin and generic doxycycline throughout the Class Period. Thus, Defendants have oligopolistic market power in the generic digoxin and generic doxycycline markets, which enables Defendants to increase prices without losing market share.

(6)    *Opportunities for Contact and Communication among Competitors* - Certain Defendants are members of trade association GPhA which provides and promotes opportunities to communicate. Lannett's CEO made statements that Lannett and its competitors would not compete on price. The issuance of grand jury subpoenas to Defendants also supports the potential for communication among Defendants on the pricing of generic digoxin and generic doxycycline.

---

[64] Lannett Q1 2014 Earnings Call Transcript (Nov. 7, 2013).

172.     The structure and other characteristics of the markets for doxycycline and digoxin tablets make them conducive to collusion and price-fixing. During the Class Period, the markets for digoxin tablets and doxycycline exhibited the characteristics identified above.

173.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. Thus, barriers to entry help facilitate the formation and maintenance of a cartel.

174.     The markets for doxycycline and digoxin tablets have high barriers to entry.

175.     Even though doxycycline and digoxin tablets are not protected by any patents, regulatory hurdles can pose a challenge. Any generic drug manufacturer seeking to enter the markets for digoxin tablets or doxycycline must file an ANDA and receive FDA approval.

176.     Prospective generic manufacturers must also be able to satisfy FDA regulations and guidance governing bioequivalence and bioavailability of their doxycycline and digoxin products. This requires showing that the proposed generic doxycycline and digoxin products have, among other things, the same therapeutic qualities and absorption profiles as their branded counterparts.

177.     Moreover, a generic manufacturer that cannot produce the active pharmaceutical ingredient ("API") for digoxin tablets or doxycycline must have a reliable source of API.

178.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline, if any, in the quantity sold of that product. In

other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase the product despite the price increase.

179.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether.

180.    Demand for doxycycline and digoxin tablets are highly inelastic because both are unique products: digoxin is a unique compound that is used for the treatment of atrial fibrillation and heart failure; doxycycline is similarly unique in that it is used to treat a broad spectrum of bacterial infections.

181.    Thus, purchasers of doxycycline and digoxin tablets are held captive to the supra-competitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

182.    A concentrated market is more susceptible to collusion and other anticompetitive practices. Both markets for doxycycline and digoxin tablets are highly concentrated.  Defendants possess large market shares in their respective markets. Between October 2013 and the present, after substantial consolidation in the market, there were only a handful of manufacturers of generic digoxin tablets/ Similarly, although there were as many as 20 generic manufacturers producing doxycycline over the past two decades, those numbers of have steadily decreased, thereby substantially increasing the concentration in the doxycycline market.

183.    Because there were a limited number of doxycycline and digoxin manufacturers in the market, it facilitated their ability to coordinate pricing of their respective products. This

concentration also made it easy for them to monitor prices in the downstream market and police deviations from agreed-upon prices.

184.     Because Defendants' anticompetitive conduct constitutes a horizontal conspiracy among suppliers of the same commodity-like product to fix prices, a per se violation exists of Section 1 of the Sherman Antitrust Act and the state laws pled below. Accordingly, Plaintiff does not need to define a relevant product or geographic market.

185.     If, alternatively, the "rule of reason" is deemed to apply, then the relevant market for each product is the market for generic digoxin and generic doxycycline, both in the geographic market of the United States.

186.     At all relevant times, Defendants possessed and maintained market power and dominated the generic digoxin and generic doxycycline market in the United States.

## VIII.   CLASS ACTION ALLEGATIONS

187.     Plaintiff brings this action on its own behalf and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All Independent Pharmacies that indirectly purchased generic digoxin and/or generic doxycycline for resale from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between January 1, 2012 and the present. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

188.     Plaintiff also brings this action on behalf of itself and as a class action under Federal Rules of Civil Procedure 23(a) and (b)(3), seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws as well as common law unjust enrichment on behalf of the following classes (the "Damages Classes"):

All Independent Pharmacies located in the Indirect Purchaser States[65] that indirectly purchased generic digoxin and/or generic doxycycline for resale from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between January 1, 2012 and the present.  Excluded from the Damages Classes are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

189.   The Nationwide Class and the Damages Classes are referred to herein collectively as the "Classes"; and their members as the "Independent Pharmacies."

190.   The members of the Classes are readily ascertainable from records maintained by the PBMs, PSOAs and the NCPA. Moreover, the class definitions enable every member of the Classes to identify itself as a class member.

191.   Members of the Classes are so numerous that joinder is impracticable.  According to the National Community Pharmacists Association ("NCPA"), there are an estimated 22,478 small business community pharmacies across the United States.[66] They are geographically dispersed such that joinder of all class members is impracticable.

192.   Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff's interests are not antagonistic to the claims of the other Class members, and there are no material conflicts with any other member of the Classes that would make class certification inappropriate. Plaintiff and all members of the Classes were damaged by the same wrongful conduct of Defendants.

193.   Plaintiff will fairly and adequately protect and represent the interests of the Classes.  The interests of Plaintiff are coincident with, and not antagonistic to, those of the Classes.

---

[65] The Indirect Purchaser States are the states listed in Counts II and III, and each state class comprises entities that have made indirect purchases of Defendants' generic digoxin and generic doxycycline products in the state.

[66] http://www.ncpanet.org/home/independent-pharmacy-today.

194.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation, and who have particular experience with class action litigation involving alleged violations of antitrust law.

195.     Questions of law and fact common to the claims of Plaintiff and the members of the Classes predominate over questions that may affect the claims of only individual Class members because Defendants have acted on grounds generally applicable to the members of the Classes.

196.     The common legal and factual questions, which do not vary from Class member to Class member, and which may be determined without reference to individual circumstances of any Class member include, but are not limited to, the following:

(a)     Whether Defendants and their co-conspirators engaged in a contract, combination or conspiracy to artificially increase the prices of generic digoxin and generic doxycycline in the U.S.;

(b)     The duration and extent of the alleged contract, combination or conspiracy;

(c)     Whether Defendants and their co-conspirators were participants in the contract, combination or conspiracy alleged herein;

(d)     The effect of the contract, combination or conspiracy on the prices of generic digoxin and generic doxycycline in the United States during the Class Period;

(e)     Whether Defendants' conduct caused supra-competitive prices for generic digoxin and generic doxycycline;

(f)     Whether, and to what extent, the conduct of Defendants and their co-conspirators caused injury to Plaintiff and other members of the Classes;

(g)     Whether the alleged contract, combination or conspiracy violated Sections l and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

(h)     Whether, and to what extent, the conduct of Defendants caused injury to Plaintiff and the other members of the Classes, and if so, the appropriate measure of damages; and

(i)     Whether Plaintiff and the other members of the Classes are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Sections 1 and 3 of the Sherman Act;

(j)     Whether the alleged contract, combination or conspiracy violated the state antitrust laws alleged in Count II below;

(k)     Whether the alleged contract, combination or conspiracy violated the state unfair competition laws alleged in Count III below;

(l)     Whether Plaintiff and the other members of the Classes are entitled to recover damages, treble damages and/or restitution as a result of Defendants' violations of the state laws alleged in Counts II and III below.

197.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

198.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

199.     Class treatment will permit adjudication of relatively small claims by many Class members that otherwise could not afford to litigate an antitrust claim such as is asserted in this compliant on an individual basis.

200.     The Classes are readily definable through data obtainable from sources including, but not limited to, purchasing data and records of PBMs, PSAOs and the NACP.

201.     Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## IX.     ANTITRUST INJURY

202.     Defendants' conspiracy has had the following effects, among others:

a.     Price competition has been unreasonably restrained or eliminated with respect to generic digoxin and generic doxycycline and;

b.     The prices of generic digoxin and generic doxycycline have been fixed, raised, maintained, or stabilized at artificially inflated levels.

203.     During the Class Period, Defendants charged supra-competitive prices for generic digoxin and generic doxycycline.  By reason of Defendants' alleged violations of the antitrust laws, Plaintiff and the Classes have sustained injury, having paid higher prices for generic digoxin and generic doxycycline than they would have paid absent Defendants' alleged illegal contract or conspiracy, and, as a result, have suffered damages in an amount to be determined. This is an antitrust injury of the type the antitrust laws were meant to punish and prevent.

204.    Generic digoxin and generic doxycycline, regardless of form, are identifiable, discrete products that remain unchanged from the point at which they are sold by Defendants until they reach Plaintiff and the class.  Generic digoxin and generic doxycycline follow a traceable physical chain of distribution from defendants to Plaintiff and the members of the Classes, and price and cost changes attributable to Defendants' price-fixing conspiracy can be traced through the chain of distribution.

205.    The direct purchasers from which the Independent Pharmacies acquire generic digoxin and doxycycline pass through defendants' anticompetitive price increases to Plaintiff and the Classes.  Direct purchasers from defendants have thin net margins, and are therefore at the mercy of their product costs, such that increases in the price of generic digoxin and generic doxycycline lead to corresponding increases in prices to their customers.  When downstream distribution markets are highly competitive, as they are in the case of generic digoxin and generic doxycycline, overcharges are passed through to indirect purchasers, such as Plaintiff and the Classes of Independent Pharmacies.

206.    Hence the inflated prices of generic digoxin and generic doxycycline resulting from Defendants' price-fixing conspiracy have been passed on to Plaintiff and the other members of the Classes by wholesalers and distributors.

207.    Plaintiff and the other members of the Classes were prevented from passing on the cost of Defendants' overcharges to their own pharmacy customers, by the following industry rules and market forces:

a.      Medical insurance company allowable costs for generic digoxin and generic doxycycline in the ordinary and normal course did not keep pace with the steep and rapid increase in Defendants' supra-competitive prices, such that the maximum allowable cost

("MAC") to Plaintiff and the Classes for these generic drugs lagged behind Defendants' cost increases for substantial time periods, and was far below the actual cost to Plaintiff and the Classes;

      b.      Standard, industry contracts enforced by insurance company pharmacy benefit managers provide that Plaintiff and the Classes could only charge their pharmacy customers a certain maximum portion of, or capped dollar amount for, the prescription cost.

      c.      Independent pharmacies such as Plaintiff and the Classes were not able to charge their customers high out-of-pocket dollar costs beyond what patients' medical insurance plans allow for generic drugs, as Independent Pharmacies' contracts with health plans and/or their PBMs did not permit it.

      d.      Because Plaintiff and the Classes could not recoup the steep cost of Defendants' anticompetitive overcharges from their customers, they were forced to absorb Defendants' unlawful and supra-competitive price increases for substantial periods of time.

208.    Defendants' overcharges impacting the prices of generic digoxin and generic doxycycline can be measured and quantified.  Commonly used and well-accepted economic models can be used to measure both the existence and the amount of the supra-competitive charge passed through the chain of distribution.  Thus, the economic harm to Plaintiff and the other members of the Classes can be quantified.

209.    Defendants' anticompetitive conduct is ongoing, and, as a result, Plaintiff and the Classes continue to pay supra-competitive prices for generic digoxin and generic doxycycline.

## X.      FRAUDULENT CONCEALMENT AND TOLLING

210.     Plaintiff and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until shortly before this litigation commenced.

211.     Plaintiff and the other members of the Classes are Independent Pharmacies who purchased generic digoxin and doxycycline.  They had no direct interaction with Defendants and had no means from which they could have discovered the combination or conspiracy described in this Complaint prior to shortly before this litigation commenced.  Plaintiff and the other members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants were violating the law as alleged herein until shortly before this litigation commenced.

212.     No information in the public domain was available to Plaintiff or the other members of the Classes prior to public disclosure of the DOJ's investigation of Defendants in connection with generic digoxin and doxycycline, which only recently revealed sufficient information to suggest that Defendants were involved in a conspiracy to fix prices for these drugs.  Plaintiff and the other members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with direct purchasers of such drugs, much less the fact that they and their co-conspirators had engaged in the combination or conspiracy alleged herein.

213.     For these reasons, the statute of limitations as to Plaintiff and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiff and the other members of the Classes have alleged in this Complaint.

214.    Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct against Plaintiff and the Classes.

215.    Plaintiff and the Classes could not have discovered the violations earlier than they did, just prior to the filing of this Complaint, because Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.  In addition, the conspiracy was by its nature self-concealing.

216.    Defendants engaged in a successful, illegal price-fixing conspiracy with respect to generic digoxin and doxycycline, which they affirmatively concealed, in at least the following respects:

a.    By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme, and by agreeing to expel those who failed to do so; and

b.    By agreeing on other means to avoid detection of their illegal conspiracy to fix the prices of generic digoxin and doxycycline.

217.    As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiff and the Classes assert the tolling of any applicable statutes of limitations affecting the rights of action of Plaintiff and the members of the Classes.

## XI.    CLAIMS FOR RELIEF

### COUNT I

### Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)

218.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each of the paragraphs set forth above.

219.     Defendants are per se liable under Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3 for the injuries and damages caused by their contract, combination and conspiracy in restraint of trade as alleged herein.

220.     There is no legitimate, non-pretextual, procompetitive business justification for Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

221.     As set forth above, in violation of Sections 1 and 3 of the Sherman Act, Defendants entered into agreements with one another on the pricing of generic digoxin and generic doxycycline in the U.S. This conspiracy was per se unlawful price-fixing, or alternatively, was an unlawful restraint of trade under the rule of reason.

222.     Each Defendant has committed at least one overt act to further the conspiracy alleged in this Complaint.

223.     The conspiracy had its intended effect, as Defendants benefited from their collusion and the elimination of competition, both of which artificially inflated the prices of generic digoxin and generic doxycycline, as described herein.

224.     As a result of Defendants' unlawful conduct, Plaintiff and the other members of the Classes have been injured in their business and property in that they have paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct.  Defendants' unlawful conduct was a proximate and material cause of and/or a substantial factor in causing, this injury to Plaintiff and the Classes. The full amount of such damages is presently unknown but will be determined after discovery and upon proof at trial.

225.     Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton Act (15 U.S.C. § 26).

## COUNT II

### VIOLATION OF STATE ANTITRUST STATUTES

226.     Plaintiff incorporates and re-alleges, as though fully set forth herein, each of the paragraphs set forth above.

### Violation of Arizona Rev. Stat. §§ 44-1401, *et seq.*

227.     Plaintiff further alleges as follows:

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in Arizona.

b.     Defendants' combinations or conspiracies had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout Arizona; (2) product prices for generic digoxin and generic doxycycline were fixed, raised, maintained, and stabilized at artificially high levels throughout Arizona; and (3) Arizona Independent Pharmacies paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

c.     During the Class Period, Defendants' unlawful conduct substantially affected Arizona commerce.

d.     Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Arizona Independent Pharmacies in their business and property, and they are threatened with further such injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*[67]

**Violation of the California Cartwright Act
(Cal. Bus. & Prof. Code §§ 16720, *et seq.*)**

228.   Plaintiff further alleges as follows:

a.      Beginning at a time presently unknown to Plaintiff, but at least as early as January 1, 2012, and continuing thereafter to the present, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of trade and commerce as described above in violation of Section 16720 of the California Business and Professions Code. Defendants, and each of them, have acted in violation of Cal. Bus. & Prof. Code § 16720 to fix, raise, stabilize and maintain prices of generic digoxin and generic doxycycline at supra-competitive levels.

b.      The aforesaid violations of Cal. Bus. & Prof. Code § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, generic digoxin and generic doxycycline.

c.      During the Class Period, Defendants controlled the market for generic digoxin and generic doxycycline and therefore controlled prices in the market for generic digoxin and generic doxycycline.  Defendants competed in this market.

d.      For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above,

---

[67] In compliance with Arizona's Antitrust Act, Ariz. Rev. Stat. § 44-1415, Plaintiff mailed a copy of this Complaint to the Arizona Attorney General on the same date the Complaint was filed.

including fixing, raising, stabilizing and/or maintaining the price of generic digoxin and generic doxycycline.

      e.    The combination and conspiracy herein had, inter alia, the following effects:  (1) price competition in the sale of generic digoxin and generic doxycycline has been restrained, suppressed and/or eliminated in the State of California; (2) prices for generic digoxin and generic doxycycline sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and (3) California Independent Pharmacies that purchased generic digoxin and generic doxycycline indirectly from Defendants in California have been deprived of the benefit of free and open competition.

      f.    Defendants' combination and conspiracy constitutes a per se violation of the Cartwright Act, and is, in any event, an unreasonable and unlawful restraint of trade.

      g.    Defendants' conspiracy and the resulting impact on the market for generic digoxin and generic doxycycline occurred in and affected interstate commerce.

      h.    Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to California Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.  As a result of Defendants' violation of Cal. Bus. & Prof. Code §§ 16720 et seq., Plaintiff and the California class seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Cal. Bus. & Prof. Code § 16720(a).

**Violation of District of Columbia Code Ann. §§ 28-4501, *et seq*.**

229.   Plaintiff further alleges as follows:

a.       Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in the District of Columbia.

b.       Defendants' combinations or conspiracies had the following effects:  (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout the District of Columbia; (2) prices of generic digoxin and generic doxycycline were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) independent pharmacies in the District of Columbia paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

c.       During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

d.       Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to District of Columbia Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann.  § 28-4501, *et seq.*

## Violation of Iowa Code §§ 553, *et seq.*

230.   Plaintiff further alleges as follows:

a.       Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels,

the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in Iowa.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout Iowa; (2) prices of generic digoxin and generic doxycycline were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; and (3) Iowa Independent Pharmacies paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

c.      During the Class Period, Defendants' unlawful conduct substantially affected Iowa commerce.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Iowa Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further such injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1 et seq.  Accordingly, Iowa Independent Pharmacies in Iowa seek all forms of relief available under Iowa Code §§ 553.1 *et seq*.

### Violation of Kansas Stat. Ann. §§ 50-101, *et seq*.

231.   Plaintiff further alleges as follows:

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in Kansas.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout Kansas; (2) prices of generic digoxin and generic doxycycline were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; and (3) Kansas independent Pharmacies paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

c.      During the Class Period, Defendants' unlawful conduct substantially affected Kansas commerce.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Kansas Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of defendants' unlawful conduct, and are threatened with further such injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq.*  Accordingly, Kansas Independent Pharmacies seek all forms of relief available under Kan. Stat. Ann. §§ 50-101, *et seq*.

**Violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.**

232.    Plaintiff further alleges as follows:

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in Maine.

b.     Defendants' combinations or conspiracies had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout Maine; (2) prices of generic digoxin and generic doxycycline were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; and (3) Maine Independent Pharmacies paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

c.     During the Class Period, Defendants' unlawful conduct substantially affected Maine commerce.

d.     Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Maine Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Me. Rev. Stat. Ann. 10, §§1101, *et seq.*  Accordingly, Maine Independent Pharmacies seek all forms of relief available under Me. Rev. Stat. Ann. 10, §§1101, *et seq.*

### Violation of Michigan Antitrust Reform Act, (Mich. Comp. Laws Ann. §§ 445.771, *et seq.*)

233.     Plaintiff further alleges as follows:

a.     During the Class Period, Defendants, either directly or indirectly, sold and/or distributed generic dioxin and/or generic doxycycline in Michigan.

b.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels,

the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in Michigan.

c.      Defendants' combinations or conspiracies had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout Michigan; (2) prices of generic digoxin and generic doxycycline were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; and (3) Michigan Independent Pharmacies paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

d.      During the Class Period, Defendants' unlawful conduct substantially affected Michigan commerce.

e.       Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Michigan Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

f.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.771, *et seq.*  Accordingly, Michigan Independent Pharmacies seek treble damages and the costs of suit including attorneys' fees and reasonable costs of the action, all forms of relief available under Mich. Comp. Laws Ann. §§ 445.771, *et seq.*

**Violation of Minnesota Antitrust Law**
**(Minn. Stat. §§ 325D.50, *et seq.*)**

234.   Plaintiff further alleges as follows:

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in Minnesota.

b.     Defendants' combinations or conspiracies had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout Minnesota; (2) prices of generic digoxin and generic doxycycline were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; and (3) Minnesota Independent Pharmacies paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

c.     During the Class Period, Defendants' unlawful conduct substantially affected Minnesota commerce.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Minnesota Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minn. Stat. §§ 325D.50, *et seq*.  Accordingly, Minnesota Independent Pharmacies seek all forms of relief available under Minn. Stat. §§ 325D.50, *et seq*.

### Violation of the Mississippi Antitrust Act
### (Miss. Code Ann. §§ 75-21-1, *et seq*.)

235.   Plaintiff further alleges as follows:

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in Mississippi.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout Mississippi; (2) prices of generic digoxin and generic doxycycline were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; and (3) Mississippi Independent Pharmacies paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

c.      During the Class Period, Defendants' unlawful conduct substantially affected Mississippi commerce.

d.       Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Mississippi Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq.*  Accordingly, Mississippi Independent Pharmacies seek all forms of relief available under Miss. Code Ann. §§ 75-21-1, *et seq.*

## Violation of Nebraska Rev. Stats. §§ 59-801 et seq.

236.   Plaintiff further alleges as follows:

a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in Nebraska.  Such conduct constitutes an unlawful contract, combination, and/or conspiracy in restraint of trade, in violation of Nebraska Rev. Stat. §§ 59-801 et seq.

b.    Defendants' combinations or conspiracies had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout Nebraska; (2) product prices for generic digoxin and generic doxycycline were fixed, raised, maintained, and stabilized at artificially high levels throughout Nebraska; and (3) Nebraska Independent Pharmacies paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

c.    During the class period, defendants' unlawful conduct substantially affected Nebraska trade or commerce.

d.    Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Nebraska Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than the otherwise would have paid in the absence of defendants' unlawful conduct, and they are threatened with further such injury.  Accordingly, Nebraska Independent Pharmacies seek all forms of relief available under Nebraska Rev. Stat. §§ 59-801 et seq.

### Violation of Nevada Unfair Trade Practice Act
### (Nev. Rev. Stat. Ann. §§ 598A, *et seq.*)

237.  Plaintiff further alleges as follows:

a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels,

the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in Nevada.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout Nevada; (2) prices of generic digoxin and generic doxycycline were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; and (3) Nevada Independent Pharmacies paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

c.      During the Class Period, Defendants' or unlawful conduct substantially affected Nevada commerce.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Nevada Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nev. Rev. Stat. Ann. §§ 598A, *et seq.*[68] Accordingly, Nevada Independent Pharmacies seek all forms of relief available under Nev. Rev. Stat. Ann. §§ 598A, *et seq*.

### Violation of New Mexico Antitrust Act
### (N.M. Stat. Ann. §§ 57-1, *et seq*.)

238.    Plaintiff further alleges as follows:

---

[68] In compliance with the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. § 598A,210(3), Plaintiff mailed a copy of this Complaint to the Nevada Attorney General on the same date the Complaint was filed.

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in New Mexico.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout New Mexico; (2) prices of generic digoxin and generic doxycycline were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; and (3) New Mexico Independent Pharmacies paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

c.      During the Class Period, Defendants' unlawful conduct substantially affected New Mexico commerce.

d.       Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to New Mexico Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, *et seq*.  Accordingly, New Mexico Independent Pharmacies seek all forms of relief available under N.M. Stat. Ann. §§ 57-1-1, *et seq*.

**Violation of New York Donnelly Act**
**(N.Y. Gen. Bus. Law §§ 340, *et seq*.)**

239.   Plaintiff further alleges as follows:

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in New York.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout New York; (2) prices of generic digoxin and generic doxycycline were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; and (3) New York Independent Pharmacies paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

c.      Defendants' acts and practices set forth above were carried out with the intent to injure Plaintiff and the public.

d.      During the Class Period, Defendants' unlawful conduct substantially affected New York commerce.

e.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to New York Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

f.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.Y. Gen. Bus. Law §§ 340, *et seq.*[69] Accordingly, New York Independent Pharmacies seek to enjoin Defendants from engaging in future anti-competitive

---

[69] In compliance with the New York Gen. Bus. Law § 340(5), Plaintiff mailed a copy of this Complaint to the New York Attorney General on the same date the Complaint was filed.

practices and seek damages and all forms of relief available under N.Y. Gen. Bus. Law §§ 340, *et seq*.

g.       As required by New York General Business Law § 340(5), notice of this claim will be served upon the New York Attorney General's Office.

### Violation of North Carolina Gen. Stat. §§ 75-1, *et seq*.

240.   Plaintiff further alleges as follows:

a.       Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in North Carolina.

b.       Defendants' combinations or conspiracies had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout North Carolina; (2) prices of generic digoxin and generic doxycycline were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; and (3) North Carolina Independent Pharmacies paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

c.       During the Class Period, Defendants' unlawful conduct substantially affected North Carolina commerce.

d.       Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to North Carolina Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, *et seq.*  Accordingly, North Carolina Independent Pharmacies seek all forms of relief available under N.C. Gen. Stat. §§ 75-1, *et seq.*

### Violation of North Dakota Uniform State Antitrust Act
### (N.D. Cent. Code §§ 51-08.1-01, *et seq.*)

241.   Plaintiff further alleges as follows:

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in North Dakota.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout North Dakota; (2) prices of generic digoxin and generic doxycycline were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; and (3) North Dakota Independent Pharmacies paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

c.      During the Class Period, Defendants' unlawful conduct substantially affected North Dakota commerce.

d.       Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to North Dakota Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.D. Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, North Dakota Independent Pharmacies seek all forms of relief available under N.D. Cent. Code §§ 51-08.1-01, *et seq.*

### Violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

242.    Plaintiff further alleges as follows:

a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in South Dakota.

b.    Defendants' combinations or conspiracies had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout South Dakota; (2) prices of generic digoxin and generic doxycycline were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; and (3) South Dakota Independent Pharmacies paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

c.    During the Class Period, Defendants' unlawful conduct substantially affected South Dakota commerce.

d.    Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to South Dakota Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*. Accordingly, independent pharmacies in South Dakota seek all forms of relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

### Violation of Tennessee Trade Practices Act ("TTPA"), Tenn. Code Ann. §§ 47-25-101, *et seq*.

243.   Plaintiff further alleges as follows:

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in Tennessee.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout Tennessee; (2) prices of generic digoxin and generic doxycycline were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; and (3) independent pharmacies in Tennessee paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline. This injury is of the type the TTPA was designed to prevent. Accordingly, Plaintiff and the class seek damages to the extent permitted.

c.      During the Class Period, Defendants' unlawful conduct substantially affected Tennessee commerce.by unlawfully and unreasonably fixing, maintaining and stabilizing the price for generic digoxin and generic doxycycline, defendants blocked and otherwise denied plaintiff and the members of the class access to a free and competitive market.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Tennessee Independent Pharmacies in their

business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

      e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.*  Accordingly, independent pharmacies in North Dakota seek all forms of relief available under Tennessee Code. Ann. §§ 47-25-101, *et seq.*, including but not limited to their full consideration paid pursuant to Tennessee Code. Ann. §§ 47-25-106.

### Violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.*

244.    Plaintiff further alleges as follows:

      a.     affecting Defendants agreed to, and did in fact, act in restraint of trade or commerce by, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in Vermont.

      b.     Defendants' combinations or conspiracies had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout Vermont; (2) prices of generic digoxin and generic doxycycline were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; and (3) independent pharmacies in Vermont paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

      c.     During the Class Period, Defendants' unlawful conduct substantially affected Vermont commerce.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Vermont Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vt. Stat. Ann. 9 §§ 2453, *et seq.*  Accordingly, Independent Pharmacies in Vermont seek all forms of relief available under Vt. Stat. Ann. 9 §§ 2453, *et seq.*, including but not limited to relief pursuant to Vt. Stat. Ann 9 § 2465.

### Violation of West Virginia Antitrust Act
### (W.V. Code §§ 47-18-1, *et seq.*)

245.   Plaintiff further alleges as follows:

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in West Virginia.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout West Virginia; (2) prices of generic digoxin and generic doxycycline were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; and (3) Independent Pharmacies in West Virginia paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

c.      During the Class Period, Defendants' unlawful conduct substantially affected West Virginia commerce.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Kansas Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of W.V. Code §§ 47-18-1, *et seq.*  Accordingly, West Virginia Independent Pharmacies seek all forms of relief available under W.V. Code §§ 47-18-1, *et seq.*

**Violation of Wisconsin Stat. §§ 133.01, *et seq.***

246.   Plaintiff further alleges as follows:

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in Wisconsin.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout Wisconsin; (2) prices of generic digoxin and generic doxycycline were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; and (3) Wisconsin Independent Pharmacies paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

c.      During the Class Period, Defendants' unlawful conduct substantially affected Wisconsin commerce.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Wisconsin Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wis. Stat. §§ 133.01, *et seq.*  Accordingly, Wisconsin Independent Pharmacies seek all forms of relief available under Wis. Stat. §§ 133.01, *et seq.*

## COUNT III

## VIOLATION OF STATE UNFAIR COMPETITION STATUTES

247.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

### Violation of California Unfair Competition Law
### (Bus. & Prof. Code §§ 17200, *et seq.*)

248.    Plaintiff further alleges as follows:

a.      Cal. Bus. & Prof. Code §§ 17200, *et seq.*, ("UCL") prohibits any unlawful, unfair or fraudulent business acts or practices.

b.      Beginning on a date unknown to Plaintiff, but at least as early as January 1, 2012, and continuing thereafter to the present, Defendants committed and continue to commit acts of unfair competition, as defined by the UCL, by engaging in the acts and practices specified above.

c.      Unlawful Conduct:  As a result of engaging in the conduct alleged in this Complaint, Defendants have violated the UCL's proscription against engaging in unlawful

conduct by virtue of Defendants' unlawful violations the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et seq*.

        d.      Unfair Conduct:  Defendants have violated the UCL's proscription against unfair conduct as a result of engaging in the conduct alleged in this Complaint.  The gravity of the harms caused by Defendants' conduct outweighs any utility or justification for such conduct. Defendants' conduct as alleged herein has caused substantial harm to California Independent Pharmacies that purchased generic digoxin and generic doxycycline, which these purchasers could not reasonably have avoided, and Defendants' conduct contravenes the spirit of numerous legislatively-declared policies prohibiting such conduct.  The harm to plaintiff and the class resulting from Defendants' deceptive and unlawful practices outweighs the utility, if any, of those practices.

        e.      The illegal conduct alleged herein is continuing and there is no indication that defendants will not continue such activity into the future.

        f.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to California Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

        g.      Defendants' illegal conduct, as described herein, constitutes unlawful and unfair business acts and practices within the meaning of the UCL as interpreted by California State Courts. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Pursuant to Cal. Bus. & Prof. Code § 17203, plaintiff and the members of the class are therefore

entitled to: (1) full restitution of all monies paid to and retained by Defendants that otherwise

should not have been paid by Plaintiff and the Class, including, but not limited to, disgorgement

pursuant to Cal. Code Civ. Proc. § 384; (2) interest at the highest rate allowable by law; and (3)

payment of the attorneys' fees and costs of Plaintiff and the Class under provisions including

Cal. Code Civ. Proc. § 1021.5, or otherwise, to the extent permitted by law.

### Violation of Florida Deceptive and Unfair Trade Practices Act
### (Fla. Stat. §§ 501.201, *et seq*.)

249.    Plaintiff further alleges as follows:

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce

by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels,

the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in

Florida.

b.      The foregoing conduct constitutes "unfair methods of competition," and

"unfair or deceptive acts or practices in the conduct of any trade or commerce" within the

meaning of Florida Stat. § 501.204.

c.      During the Class Period, Defendants' unlawful conduct substantially

affected Florida commerce.

d.      Defendants' unlawful conduct had the following effects: (1) price

competition for generic digoxin and generic doxycycline was restrained, suppressed, and

eliminated throughout Florida; (2) prices of generic digoxin and generic doxycycline were

raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) Florida

Independent Pharmacies were deprived of free and open competition; and (4) Florida

Independent Pharmacies paid supra-competitive, artificially inflated prices for generic digoxin

and generic doxycycline.

e.       Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Florida Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

f.       Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq*., and accordingly, Florida Independent Pharmacies seek all relief available under that statute.

### Violation of Nebraska Consumer Protection Act
### (Neb. Rev. Stat. §§ 59-1601, *et seq*.)

250.    Plaintiff further alleges as follows:

a.       Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in Nebraska, in violation of Neb. Rev. Stat. § 59-1603.

b.       The foregoing conduct constitutes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Neb. Rev. Stat. § 59-1602.

c.       During the Class Period, Defendants' unlawful conduct substantially affected Nebraska commerce.

d.       Defendants' unlawful conduct had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout Nebraska; (2) prices of generic digoxin and generic doxycycline were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3)

Nebraska Independent Pharmacies were deprived of free and open competition; and (4) Nebraska Independent Pharmacies paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

e. Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Nebraska Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

f. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §§ 59-1601, *et seq.* Accordingly, Nebraska Independent Pharmacies seek all relief available under that statute.

**Violation of New Mexico Unfair Practices Act**
**(N.M. Stat. §§ 57-12-1, *et seq.*)**

251. Plaintiff further alleges as follows:

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in New Mexico.

b. The foregoing conduct constitutes "unfair or deceptive trade practices" and "unconscionable trade practices in the conduct of any trade or commerce" within the meaning of N.M. Stat. § 57-12-3, in that such conduct resulted in a gross disparity between the value received by New Mexico Independent Pharmacies and the prices paid by them for generic digoxin and generic doxycycline as set forth in N.M. Stat. § 57-12-2E.

c.      During the Class Period, Defendants' unlawful conduct substantially affected New Mexico commerce.

d.      Defendants' unlawful conduct had the following effects: (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout New Mexico; (2) prices of generic digoxin and generic doxycycline were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) New Mexico Independent Pharmacies were deprived of free and open competition; and (4) New Mexico Independent Pharmacies paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

e.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to New Mexico Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

f.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. §§ 57-12-1, *et seq.*  Accordingly, New Mexico Independent Pharmacies seek all relief available under that statute.

### Violation of New York Consumer Protection Act, (N.Y. Gen. Bus. Law §§ 349, *et seq.*)

252.   Plaintiff further alleges as follows:

a.      Defendants engaged in trade or commerce in New York.

b.      Defendants agreed, combined and/or conspired to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial

and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in New York.

c.      Defendants also made efforts to conceal their agreements from New York Independent Pharmacies.

d.      Defendants' unlawful conduct substantially affected New York commerce and consumers.

e.      The conduct of Defendants as described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on a wide range of consumers constituting New York Independent Pharmacies, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

f.      New York Independent Pharmacies were targets of Defendants' conspiracy.

g.      Defendant's secret agreements as described herein were not known to members of the class of New York Independent Pharmacy Purchasers.

h.      Defendants made public statements about the price of generic digoxin and generic doxycycline that Defendants knew would be seen by New York Independent Pharmacies; such statements omitted material information that rendered the statements materially misleading as to the real cause of price increases for generic digoxin and generic doxycycline; and Defendants alone possessed material information that was relevant to New York Independent Pharmacies but failed to provide this information.

i.      Because of Defendants' unlawful trade practices in the State of New York, there was a broad impact on New York Independent Pharmacies who indirectly purchased

generic digoxin and/or generic doxycycline; and New York Independent Pharmacies have been injured because they have paid more for generic digoxin and generic doxycycline than they would have paid in the absence of Defendants' unlawful trade acts and practices, and are threatened with further injury.

j.       Because of Defendants' unlawful trade practices in the State of New York, New York Independent Pharmacies who indirectly purchased generic digoxin and/or generic doxycycline were misled to believe that they were paying a fair price for those products, or that the price increases for those products were for valid business reasons.

k.       By unlawfully and unreasonably conspiring to fix, raise and maintain the prices for generic digoxin and generic doxycycline, Defendants denied consumers who are members of the class of New York Independent Pharmacies access to a free and competitive market. Defendants either knew, should have known, or recklessly disregarded that their unlawful conduct would have a broad impact, causing class members who indirectly purchased these products to be injured by paying more for them than they would have paid in the absence of Defendants' unlawful trade acts and practices.

l.       Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to New York Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

m.       New York Independent Pharmacies seek actual damages for their injuries caused by these violations in an amount to be determined at trial. Without prejudice to their contention that defendants' unlawful conduct was willful and knowing, New York Independent

Pharmacies do not seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus. Law § 349(h).

**Violation of North Carolina Gen. Stat. §§ 75-1-1, *et seq*.**

253.    Plaintiff further alleges as follows:

a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in North Carolina.

b.    Defendants also took efforts to conceal their agreements from North Carolina Independent Pharmacies, and their actions had the capacity, tendency or were likely, to deceive such purchasers.

c.    The conduct of Defendants as described herein constitutes unfair or deceptive acts and practices within the meaning of N.C. Gen. Stat. §75-1-1 et seq., which resulted in substantial injury and broad adverse impact on North Carolina commerce, and harmed the public interest of North Carolina Independent Pharmacies in an honest marketplace in which economic activity is conducted in a competitive manner.

d.    During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

e.    Defendants' unlawful conduct had the following effects: (1) price competition for  generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout North Carolina; (2) prices of generic digoxin and generic doxycycline were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) North Carolina Independent Pharmacies were deprived of fee and open

competition; and (4) North Carolina Independent Pharmacies paid supra-competitive, artificially inflated prices for generic digoxin and generic doxycycline.

f.   Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to North Carolina Independent Pharmacies in their business and property, in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

g.   During the Class Period, each of the Defendants named herein, directly or indirectly through affiliates they dominated and controlled, manufactured, sold and/or distributed generic digoxin or generic doxycycline in North Carolina.

h.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1-1, *et seq*., and accordingly, North Carolina Independent Pharmacies seek all relief available under that statute, including but not limited to, treble damages and attorneys' fees.

## COUNT IV

### UNJUST ENRICHMENT AND DISGORGEMENT OF PROFITS

254.   Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

255.   Defendants have been unjustly enriched through overpayments by Plaintiff and the members of the Classes and the resulting profits.

256.   Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred via overpayments by members of the Classes in the following states and district: Arizona, California, District of Columbia, Florida, Iowa, Kansas,

Maine, Michigan, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina,

North Dakota, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin.

257.    Plaintiff and the members of the Classes in each of the states and district listed

above seek disgorgement of all profits resulting from such overpayments and establishment of a

constructive trust from which Plaintiff and class members may seek restitution.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the members of the Classes pray for relief as set forth

below:

A.       Certification of the action as a class action pursuant to Federal Rule of Civil

Procedure 23, and appointment of Plaintiff as class representative for the Classes and its counsel

of record as class counsel for the Classes;

B.       Permanent injunctive relief enjoining and restraining Defendants and their co-

conspirators, their respective successors, assigns, parents, subsidiaries, affiliates and transferees,

and their respective officers, directors, agents, and employees, and all other persons acting or

claiming to act on behalf of Defendants or their coconspirators, or in concert with them from, in

any manner, directly or indirectly, continuing to maintain or renew the combination, conspiracy,

agreement, understanding or concert of action, or adopting any practice, plan, program or design

having a similar purpose or effect in restraining competition; and;

C.       That acts alleged herein be adjudged and decreed to be unlawful restraints of

trade, and per se unreasonable restraints of trade, in violation of Sections 1 and 3 of the Sherman

Act, 15 U.S.C. §§ 1, 3;

D.      A judgment against Defendants, jointly and severally, for the damages sustained by Plaintiff and the Classes defined herein, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages;

E.      An award to Plaintiff and the members of the Classes of pre-judgment and post-judgment interest as provided by law, calculated at the highest legal rate from and after the date of service of the Complaint in this action;

F.      The costs of this suit, including reasonable attorney fees;

G.      Such other and further relief as the Court deems just and proper.

## XIII.   DEMAND FOR JURY TRIAL

Plaintiff, on behalf of itself and others similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on all claims asserted herein that are so triable.

Dated: November 10, 2016

By: _Michael J. Boni_
Michael J. Boni (Pa Bar ID 52983)
Joshua D. Snyder (Pa Bar ID 88657)
BONI & ZACK LLC
15 St. Asaphs Road
Bala Cynwyd, PA  19004
Telephone: (610) 822-0200
Facsimile:  (610) 822-0206
mboni@bonizack.com
jsnyder@bonizack.com

Kimberly A. Kralowec (Cal. Bar No. 163158)
Kathleen Styles Rogers (Cal. Bar No. 122853)
THE KRALOWEC LAW GROUP
44 Montgomery St., Ste. 1210
San Francisco, CA  94104
Telephone: (415) 546-6800
Facsimile: (415) 546-6801
kkralowec@kraloweclaw.com
krogers@kraloweclaw.com

Joseph J. Tabacco, Jr. (SBN 75484)
Christopher T. Heffelfinger (SBN 118058)
Todd A. Seaver (SBN 271067)
BERMAN DEVALERIO
One California St., Ste. 900
San Francisco, CA  94111

Telephone:  (415) 433-3200
Facsimile:  (415) 433-6382
tseaver@bermandevalerio.com

*Attorneys for Plaintiff and the Independent
Pharmacies Classes*